SALVADORA RUIZ SÁNCHEZ, demandante y recurrida, *v.* SAN JUAN RACING ASSOCIATION y TRANS OCEANIC INSURANCE Co., demandadas y recurrentes.

*Número*: R-72-183        *Resuelto*: 27 de febrero de 1974

*Max Olivera Mariany,* abogado de las recurrentes; *José Francisco Quetglas Álvarez* y *Francisco M. Vázquez Santoni,* abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

Por resolución de 25 de abril de 1973 decidimos revisar la sentencia del Tribunal Superior, Sala de San Juan, causa civil número 70-357, por virtud de la cual se condenó a San Juan Racing Association y su aseguradora Trans Oceanic Insurance Co. a indemnizar a Salvadora Ruiz Sánchez en la cantidad de $16,333.40, más costas y $1,000 de honorarios de abogado. Examinados los autos originales y leída la voluminosa transcripción de todas las incidencias del juicio celebrado es forzoso concluir que incidió el tribunal sentenciador al aquilatar la prueba, ignorando o prescindiendo de considerar hechos que poderosamente señalan hacia la elaboración de una ilegítima causa de acción contra las partes demandadas.

El 26 de enero de 1969 la señora Salvadora Ruiz Sánchez se encontraba en el Hipódromo El Comandante, donde fue a jugar a los caballos y a su vez vender billetes de lotería. Al concluir el programa de carreras, a eso de las seis de la tarde, sufrió una caída mientras trataba de abandonar dicho lugar, en momentos en que llovía y en que la gente avanzaba para salir. Exactamente el día en que vencía el año de prescripción que fija el Art. 1868 del Código Civil, 31 L.P.R.A. sec. 5298, es decir, el 26 de enero de 1970, la señora Ruiz Sánchez presentó y quedó radicada en la secretaría del tribunal de instancia

una demanda contra la San Juan Racing Association y Trans Oceanic Insurance Company reclamando ser indemnizada por los daños y perjuicios que sufrió con motivo de la caída. ([1]) Expuso en su demanda, párrafo 2, lo siguiente como causa de su caída:

"2. Que cuando se terminaron las carreras de ese día y al salir la demandante de la sección de preferencias de dicho Hipódromo hacia el área de estacionamiento, recibió la demandante un fuerte empujón, el cual provocó su caída al suelo. Una vez en el suelo, tres hombres que corrían debido a que estaba lliviendo, [sic] le pasaron por sobre su cuerpo y uno de ellos la pisó en la región pélvica."

Las demandadas contestaron oportunamente la demanda negando responsabilidad y adujeron que la misma "no aduce hechos constitutivos de una causa de acción." La demandante formuló interrogatorios escritos requiriendo de las demandadas, entre otras cosas, que le informaran "su versión de como ocurrió el accidente" y "la prueba documental que utilizará en la vista en su fondo" del caso. ([2]) Dichos interrogatorios fueron contestados el 15 de febrero de 1971, dando como versión del accidente prácticamente la misma contenida en la demanda y anunciando entre la prueba documental una declaración prestada por la demandante. Dicha declaración, presumiblemente examinada por los abogados de la demandante luego de una moción presentada por ellos el 26 de febrero de 1971 para que se le permitiera examinar y copiar la prueba documental anunciada por las demandadas, y respecto de la

---

([1]) El mismo día del accidente fue hospitalizada, diagnosticándose una "fractura intertrocantérica de la cadera derecha." Fue operada el 30 de enero para reducción de la fractura y fijación con clavos y una plancha metálica y dada de alta del hospital el 13 de febrero siguiente. Resultó con acortamiento de su extremidad inferior derecha y reducción en la circunferencia del muslo y la pantorilla de dicha extremidad así como limitación en los movimientos de flexión y abducción de la cadera, moderada limitación de rotación interna y externa y debilitamiento en la fuerza de los *cuadriceps,* y limitación en el movimiento de flexión de la rodilla. El tribunal a quo valoró dichos daños y sus sufrimientos físicos y mentales en $12,000.

([2]) Preguntas 1 y 3, respectivamente.

cual recayó una orden que así lo dispuso, de fecha 8 de marzo de 1971, fue luego admitida como prueba por estipulación de todas las partes y obra en autos. Fue prestada por la demandante en el hospital en que estaba recluida, el 6 de febrero de 1969, a pedido de un ajustador independiente encargado de investigar el accidente por la compañía aseguradora codemandada. En lo aquí pertinente, lee así:

"Que el día 26 de Enero 1969 como a eso de las 6:00 P.M. me encontraba en el Hipódromo El Comandante, y después que se acabaron las carreras salía yo de las graderías y cuando me dirigía al portón de salida, debido a que estaba lloviendo estaban saliendo corriendo otras personas y tropezaron conmigo y me caí."

Más adelante, al final de la declaración, expresó: "Yo no conocía ninguna de las personas que tropezaron conmigo. El único motivo de mi caída fue el tropezón."

La declaración fue manuscrita por el ajustador. Al calce de la misma, una hija de la demandante, María M. Aguirre de Fonseca, maestra de escuela pública, (3) escribió de su puño y letra lo siguiente, que firmó junto al nombre de la demandante, escrito por la primera:

"He leído este informe a la Sra. Salvadora Ruiz que es mi madre y ella dice que es la verdad de lo sucedido. También soy testigo de su firma." (4)

El 25 de junio de 1971, ya señalado el caso para juicio para celebrarse el 20 de septiembre de 1971, la demandante, contestando un interrogatorio de las demandadas, dio la siguiente versión del accidente:

_____

(3) Transcripción de la vista del 26 de enero de 1972, pág. 70.

(4) La demandante hizo una cruz al lado de su nombre. Su hija María M. Aguirre de Fonseca prestó testimonio en el acto del juicio y expresó haber estado presente mientras el ajustador entrevistaba a su señora madre, haber escrito la anotación que hemos transcrito y haberlo hecho luego de leerle la declaración a la demandante y preguntarle si "eso había ocurrido así" y la demandante haberle contestado afirmativamente moviendo la cabeza. (Transcripción de la vista celebrada el 26 de enero de 1972, págs. 72 y 73.)

"4. El día 26 de enero de 1969 yo me encontraba visitando el Hipódromo El Comandante propiedad de la San Juan Racing, donde había jugado unas dupletas y cuando se terminaron las carreras salía del área de preferencias del Hipódromo hacia el área de estacionamiento, *mientras caminaba tropecé con algo que había en el piso al mismo momento que recibía un fuerte empujón de personas que corrían para salir de dicho sitio.* Una vez en el suelo pasaron sobre mi cuerpo algunas de las personas que salían corriendo y una de ellas me pisó la región pélvica, sufriendo fuerte golpes y lesiones en diferentes partes del cuerpo, luego fui llevada a la enfermería del Hipódromo de donde me trasladaron al Hospital Universitario y luego hospitalizada y operada en el Auxilio Mutuo." (⁵) (Énfasis nuestro.)

El 20 de septiembre no se celebró el juicio. La demandante quería enmendar su demanda. (⁶) El 11 de noviembre siguiente presentó moción escrita solicitando permiso para ello, la que acompañó de una propuesta demanda enmendada. La enmienda consistía en sustituir la versión original por la dada en la contestación al interrogatorio de las demandadas y que hemos transcrito. Las demandadas se opusieron por escrito. El tribunal a quo nada proveyó respecto de dicha solicitud. Al llamarse el caso para juicio se planteó nuevamente la cuestión sobre la propuesta demanda enmendada y el tribunal a quo se negó a proveer. Las demandadas, por voz de su abogado, expresaron: ". . . Entendemos que no hay demanda enmendada al presente y estamos listos para juicio a base de las alegaciones de la demanda original, según contestadas." (Transcripción, inicio de la primera vista, de 25 de enero de 1972, pág. 7.) Luego de argumentos por ambas partes el juez expresó que se planteaba "una situación que es bastante delicada y no quisiera resolver en este instante." (Transcripción, Id. *supra*, pág. 31.) Nunca resolvió.

No puede concluirse tampoco que las alegaciones fueron enmendadas por la prueba, conforme lo autoriza la Regla 13.2

---

(⁵) Contestación a la pregunta número 4 del referido interrogatorio de las demandadas, pág. 43 de los autos originales.

(⁶) Minuta de ese día.

de Procedimiento Civil. En adición a la advertencia consignada por el abogado de las demandadas al iniciarse la vista del caso, que hemos transcrito, oportunamente objetó la prueba que la demandante pretendió aportar para probar su segunda versión de los hechos. Desde el mismo comienzo del testimonio de la demandante (pág. 46 de la Transcripción) objetó, y el juez expresó: "Fue lo que dijimos que está sujeta a la resolución posterior, luego que se elimine si no procede." (Transcripción, pág. 47.)

Al formular sus determinaciones de hechos el tribunal sentenciador adoptó la segunda versión de la demandante. Nunca antes de así hacerlo recayó determinación alguna admitiendo la demanda enmendada. Hasta tanto no se admitiera dicha demanda enmendada, toda la prueba para establecer la versión en ella alegada era inadmisible y, como hemos señalado, fue oportunamente objetada. No es irrazonable que en determinadas circunstancias un juez posponga su resolución sobre un planteamiento de derecho. Empero, debe hacer saber su dictamen lo antes posible sobre todo cuando, como en este caso, la admisibilidad de la prueba tenía que depender necesariamente de a qué alegaciones se enfrentaban las demandadas. Bajo las circunstancias aquí presentes, fue irrazonable no resolver oportunamente la cuestión planteada.

No hemos perdido de vista que el tribunal a quo practicó una inspección ocular en el Hipódromo El Comandante. Halló, al final de un pasadizo, saliendo de las graderías, entre una cafetería y una escalera, una plancha de metal que al ser presionada, una esquina bajaba como una pulgada y la otra subía. (Conclusión de hecho número 2.) Ese sitio fue señalado por la demandante en el acto de la inspección ocular como aquél en que tropezó y se cayó. Es curioso e interesante notar que, aparte de la importante discrepancia entre las dos versiones dadas por la demandante sobre cómo ocurrió la caída, haya discrepancia también, en sus propias alegaciones y su prueba, sobre el sitio en que se cayó. Alegó en la demanda

original que ella salía "de la sección de preferencias de dicho hipódromo hacia el área de estacionamiento." Al requerírsele en el interrogatorio de las demandadas que dijera el sitio exacto donde alegadamente ocurrió el accidente (pregunta número 31), se limitó en su contestación a hacer referencia a la contestación dada a la pregunta número 4, transcrita supra, que le requería su versión detallada de la "forma y manera en que ocurrió el accidente." Dicha contestación número 4 omitió dar el sitio exacto, limitándose a la misma generalidad dada en la demanda, es decir, entre el área de preferencias y el área de estacionamiento. En su testimonio la demandante, en vez de colocarse en el área de preferencias, dijo que "estaba en el sótano, abajo," subió por la escalera al segundo piso, "donde están las dos cafeterías," y le ocurrió el accidente. (Transcripción, pág. 44.) A la pregunta de "¿le sucedió algo allí?," contestó: "Bueno, cuando yo estaba en la Cafetería, así, hay un saguan, [sic] un poco estrecho, hay como un redondel de lata, parece como un contador de agua, ahí tropecé, el zapato se me enredó y caí a lo largo y la gente me empujaba, la gente me empujaban y pasaban por encima y me pasaron por encima, como todo el mundo quería salir." (Transcripción, pág. 45.)

■ Ante esa discrepancia adicional forzoso es dudar si la demandante se cayó en el sitio que le indicó al juez de instancia durante la inspección ocular. Si fue allí, ¿por qué lo ocultó al contestar el interrogatorio? ¿Por qué no lo dijo, siendo natural que lo dijera, cuando fue entrevistada por un ajustador de la compañía aseguradora en presencia de su hija el 6 de febrero de 1969? ¿Lo ocultó también a su abogado? Un testigo se impugna no solamente por manifestaciones suyas incompatibles con su testimonio en corte sino también por haber omitido en ocasión anterior hacer referencia a un hecho esencial que hubiera sido natural que expusiera. *Pueblo* v. *Cortés del Castillo,* 86 D.P.R. 220, 224–225 (1962).

La versión dada originalmente por la demandante en su demanda, además de reiterarla en la declaración prestada al ajustador, está corroborada en los expedientes médicos del hospital en que fue tratada, que obran en autos como parte de su propia prueba. Dichos expedientes informan que la paciente "sufrió una caída desde sus propios pies". (Hojas 3 y 24 del expediente médico, admitido como *Exhibit I* de la Demandante.) Es natural que a una persona que se cae le pregunten por qué se cayó o que ella lo diga espontáneamente. Decir una persona que se ha caído de sus propios pies es muy distinto a decir que se ha caído porque tuvo un tropezón.

■ Es saludable el principio que obliga a respetar las determinaciones de hechos de un tribunal de instancia cuando éstas tienen apoyo en la prueba que tuvo ante sí. No obstante, y con base en la Regla 43.1 de Procedimiento Civil, y antes en la 52 (a) de las Reglas de Enjuiciamiento Civil de 1943, no hemos vacilado en dejar sin efecto determinaciones de hechos que, aunque sostenidas en prueba aportada, resultan claramente erróneas. *Prieto* v. *Maryland Casualty Co.*, 98 D.P.R. 594 (1970); *Ortiz Rodríguez* v. *A.F.F.*, 94 D.P.R. 546 (1967); *Maryland Casualty Co.* v. *Quick Const. Corp.*, 90 D.P.R. 329 (1964) y *Sanabria* v. *Sucn. González*, 82 D.P.R. 885 (1961). La prueba de la demandante, bajo las circunstancias de este caso, no puede en Derecho ser considerada satisfactoria por cuanto no produce una certeza o convicción moral. Art. 375, Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 1633. La candidez es una deseable condición humana aun entrada la madurez de los años, pero no debe dejarse sorprender para provecho de la iniquidad. Dijimos en *Pueblo* v. *Luciano Arroyo*, 83 D.P.R. 573, 582 (1961), Serrano Geyls, J.: "Los jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones que nadie más creería."

■ Es inconcebible para nosotros que al entrevistarse con sus abogados, de ser cierto que su caída se debió a un tropezón

y no a que la empujaran, la demandante no lo expresara así a ellos. Más inconcebible aún sería que al redactarse la demanda por los abogados estos se apartasen de la versión dada por la demandante para alegar otra que nada aduce en lo concerniente a responsabilizar a las demandadas. La intrascendente y fútil aseveración de la demanda original no podía tener otro resultado que su desestimación, a menos que la inexistente causa de acción fuese transigida por lo que se ha dado en llamar el *nuisance value*. No podemos dar por sentado que este último fuera el fin perseguido por los abogados. Por el contrario, tenemos que presumir que actuaron con sentido de responsabilidad y en obediencia a los Cánones de Ética Profesional. ([7]) La iniciación de pleitos inmeritorios con conocimiento de ello es repulsiva al proceder responsable de un abogado. Estamos conscientes de que en ocasiones los demandados, particularmente compañías de seguros, están prestos a pagar una cantidad nominal a un demandante que no tiene caso para librarse de incurrir en los gastos que conllevaría el tenerse que defender, especialmente si el demandante no está en condiciones de pagar honorarios de abogado y costas. Iniciar un pleito con miras a tomar ventaja de esa circunstancia constituiría una práctica indeseable y reprobable por demás.

*Se dictará sentencia revocando la dictada por el Tribunal de instancia y en su lugar ordenando la desestimación de la demanda.*

---

([7]) El Código de Ética Profesional que rige la conducta de los abogados dispone como sigue:

Canon 17.—"Todo abogado debe negarse a representar a un cliente en un caso civil cuando estuviere convencido de que se pretende por medio del pleito molestar o perjudicar a la parte contraria, haciéndole víctima de opresión o daño. Su comparecencia ante un tribunal debe equivaler a una afirmación sobre su honor de que en su opinión el caso de su cliente es uno digno de la sanción judicial. La firma de un abogado en una alegación en un caso equivale a certificar que ha leído la alegación y que de acuerdo con su mejor conocimiento, información y creencia está bien fundada." (4 L.P.R.A., Ap. IX, C. 17.)