NORBERTO QUINTANA TIRADO y BLANCA JUSINO LARA-
CUENTE, demandantes y recurridos, *v.* HERNÁN LONGO-
RIA e ISABEL VÉLEZ, demandados, y recurrente la
segunda.

*Número:* R-80-179 *Resuelto:* 11 de marzo de 1982

*Francisco Ariel Avilés Rodríguez* y *Ángel L. Tapia Flores*, abogados de la codemandada-recurrente Isabel Vélez; *Jovino Martínez Ramírez*, abogado del demandante-recurrido; *Enrique Báez García*, abogado del codemandado-recurrido Hernán Longoria.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Nos toca juzgar nuevamente uno de los actos principales del lento y angustioso drama escenificado entre el abogado Hernán Longoria y su ex esposa Isabel Vélez, con relación a los bienes habidos durante su matrimonio. Los antecedentes procesales que lo inician se remontan al 22 de septiembre de 1971, fecha en la cual Isabel Vélez otorgó escritura de poder general a favor de su esposo Lic. Hernán Longoria, facultándole disponer de todos sus bienes muebles e inmuebles situados en Puerto Rico y reconociéndole otras prerrogativas. Así las cosas, el 18 de julio de 1973, por sí y en representación de su esposa, otorgó escritura hipotecando una finca rústica para garantizar un pagaré al portador por la suma de $60,000 con intereses al 8% anual que fuera entregado a Norberto Quintana Tirado. Un día después, o sea, el 19 de julio de 1973, Isabel Vélez de Longoria, mediante instrumento público revocó ese poder general. La escritura de revocación fue presentada en el Registro de Poderes y Testamentos de este Tribunal ese mismo día.

Subsiguientemente, el 20 de mayo de 1975 los esposos Quintana-Jusino, radicaron demanda en ejecución de hipoteca por la vía ordinaria, reclamando el pago de los $60,000, intereses, costas y gastos de honorarios de abogado contra los esposos Longoria-Vélez. Longoria compareció y aceptó todos los hechos alegados. Levantó ciertas defensas afirmativas, en las que alegó tener bienes suficientes para pagar la obligación, pero que por razón de estar pendiente

una acción de divorcio demorada sin su culpa le había sido imposible satisfacerla. Invocó el poder inherente del tribunal para hacer justicia y suplicó se le autorizara gestionar su pago con cargo a la sociedad de gananciales y en protección de la misma.

También compareció al pleito Isabel Vélez, negando todas las alegaciones por falta de conocimiento. Levantó varias defensas afirmativas, entre ellas que "[l]a Demanda objeto de este pleito es el resultado de la acción concertada fraudulenta del Demandante con el Codemandado Hernán Longoria Quiñones encaminadas a defraudar y privarle de su participación ganancial a la Codemandada en la Sociedad Legal de Gananciales que tiene compuesta con su esposo el Codemandado . . .". Invocó además falta de causa para el contrato. Posteriormente formuló reconvención y demanda contra coparte. Específicamente alegó que la parte demandante y el codemandado Longoria habían celebrado un contrato de arrendamiento el día 21 de agosto de 1973, mediante la escritura pública Núm. 48, sobre otras tres fincas de su sociedad legal de gananciales; que dicho contrato era nulo, por ésta no haber comparecido a la firma del mismo —habiéndose ya revocado el poder general—; que estas actuaciones combinadas del demandante y codemandado eran hechas para defraudarla y privarla de su participación legal y ganancial en dichos bienes; y que tales actos nulos e ilegales le habían causado daños morales y perjuicios por cánones de arrendamiento dejados de percibir ascendentes a $60,000.

Previo trámites de rigor se ventiló el caso en su fondo. Las partes presentaron evidencia documental y testifical. Esta última —como veremos— resulta de suma importancia, pues, según la credibilidad merecida, a la luz de las alegaciones, se afectará directamente el resultado. Tiempo después, el tribunal dictó sentencia declarando con lugar la demanda y sin lugar la reconvención y demanda de coparte.

A solicitud de Isabel Vélez acordamos revisar. Resolvemos sin el beneficio del alegato del codemandado-recurrido Longoria, quien se abstuvo de someterlo dentro del término concedido.

Los cuatro errores levantados por la codemandada-recurrente Vélez podemos analizarlos en tres dimensiones, a saber: (1) si medió fraude o simulación entre el demandante y el codemandado Longoria al este último incurrir en la obligación objeto del litigio, para defraudar a la sociedad legal de gananciales compuesta por él y la codemandada; (2) si el dinero objeto de la deuda fue utilizado por Longoria para mejorar bienes gananciales; y (3) si el tribunal de instancia resolvió todas las cuestiones que le fueron sometidas a su consideración.

I

*¿Hubo simulación o fraude?*

Para demostrar la existencia y validez de la obligación reclamada, los demandantes, además de la prueba documental, presentaron dos testigos: el propio demandante Norberto Quintana y el codemandado Longoria. Por el impacto decisorio que ambos testimonios conllevan, los examinaremos con detenimiento. Comenzando con este último, esencialmente Longoria declaró que residía en una casa ganancial sita en La Parguera;[1] que conocía a los

---

[1] En cuanto a esta afirmación, fue confrontado con la determinación de hecho Núm. 5 de la sentencia de divorcio que, dictada el 4 de agosto de 1977 por el mismo tribunal y magistrado, había concluido:

"Al Tribunal no le mereció crédito el testimonio dado por el Demandante-Demandado y en especial su versión de los hechos y al declarar que desde que abandonó el hogar conyugal, hasta la actualidad, ha estado viviendo en la casa ubicada en el Barrio La Parguera, Lajas, Puerto Rico. Quedó demostrado por el propio testimonio del Lcdo. Longoria que dicha casa no tiene servicio de luz eléctrica por haber sido cortada y la propia hija de las partes, Sra. Olga Longoria Vélez declaró que la casa está completamente deteriorada, con varias tablas caídas, que no le funciona el servicio sanitario, que la cama está desmantelada y sucia. Declaró además, que la nevera estaba apagada y llena de moho y que no hay muebles a excepción de cama y sofá. Lo que sí quedó

demandantes desde hacía 30 años, quienes le concedieron un préstamo, sin recordar la fecha, tipo de interés y si había pagado alguna cantidad por concepto de intereses de la obligación; que no había pagado el principal; que la firma que aparecía en el pagaré de $60,000 era de él. No recordaba el día de la transacción, la hora, el sitio, si había personas presentes ni cuándo sintió la necesidad de hacer el préstamo. Nadie lo sugirió. El dinero le fue entregado en efectivo en varias denominaciones. Al recibirlo lo depositó en la caja fuerte de su oficina en San Germán. Que le explicó al demandante que tenía un poder especial de su esposa y que se había comunicado con ella y ésta había dado el consentimiento. Que únicamente le explicó a su esposa que iba a hacer un préstamo para invertirlo en la conservación y mantenimiento de las propiedades. Que le afirmó que necesitaba $100,000 y le mencionó varios nombres de personas a quienes se le podía hacer el préstamo, pero no le informó nada relacionado con los intereses, la cantidad y el tiempo. Que fue abogado del demandante en un solo caso de daños y perjuicios. Que no sabe ni recuerda cuándo se revocó el poder; que el Tribunal Supremo le informó que no estaba revocado cuando lo estaba, y que supo de la revocación pasados 20 ó 30 días porque este Tribunal se lo notificó.[2] Negó que el

---

demostrado plenamente es que el Demandante-Demandado reside en la Urb. Villa Capitán y que ha sido visto en dicha casa, tanto por Doña Isabel como por su hija, a diferentes horas del día y de la noche y el carro del Lcdo. Longoria en la marquesina de dicha casa."

El tribunal de instancia tomó conocimiento judicial de dicha sentencia. Ante esa situación el testigo expuso que esa era la conclusión del tribunal, que aunque la respetaba, no era la suya. Señaló además lo siguiente: "ocasionalmente vuelvo y vivo en Villa Capitán desde un mes después de dictada la sentencia de divorcio, antes no lo hacía." (T.E., pág. 66.)

Por su parte el demandante declaró que Longoria vivía en Mayagüez; que no sabía específicamente cómo se llamaba ese lugar; que era cerca del Mayagüez Mall; y que no vivía en La Parguera. (T.E., págs. 161–162.)

[2] Tomamos conocimiento judicial de que no es práctica de la Oficina de Registros y Testamentos notificar a un mandatario que se le ha revocado el poder. La ley no lo exige. (Véase 4 L.P.R.A. sec. 922.)

licenciado Tapia se lo informara por escrito. Al así atestar fue confrontado con una carta que le envió el licenciado Tapia, con fecha del 30 de julio de 1973, y que recibió el día 4 de agosto, y entonces aclaró que dicho abogado le notificó ya cuando él se había enterado 20 ó 30 días después de revocado el poder, mediante el Tribunal Supremo, pero que no recuerda el sitio donde se enteró. (T.E., pág. 39.) Que no le entregó a la codemandada ni un centavo del préstamo y que lo invirtió en la reparación urgente de las propiedades, pero que no tenía a la mano los números exactos ni las fechas.

Declaró, además, que habló con la codemandada el día 2 ó 3 de julio de 1973 y que recordó la fecha durante el fin de semana. Que las relaciones con el demandante eran magníficas y el pleito no las había afectado. Que no informó a la codemandada de sus alegadas deudas. Que radicó la demanda de divorcio cuando ésta presentó la suya. Según los documentos[3] este hecho no es correcto, pues él radicó su demanda de divorcio el 30 de julio de 1973 y ella el 1ro de agosto. Siguió declarando que no le dijo a su esposa que pensaba radicar la demanda de divorcio, al hablar con ella el día 2 ó 3 de julio de 1973, como tampoco le informó que iba a hacer un préstamo de $50,000 al Banco de Economías, el cual realizó en mayo de 1974. Negó que adquiriera el 14 de julio de 1973, una residencia en Villa Capitán en Mayagüez por $60,000. Que no recordaba cuándo conoció a Clara Amalia Pérez, pero que sí la conocía para el 18 de julio de 1973 y que tenía una hija con ella.[5] Que no le había informado al

---

[3] Sentencia de divorcio entre los codemandados, Civil Núm. CS74-2022 y CS74-2023, Apéndice, págs. 32–42.

[4] Este préstamo fue objeto de un pleito en cobro de dinero ante el Tribunal Superior de Mayagüez (CS75-1858). Se exoneró de responsabilidad a la recurrente y a la sociedad legal de gananciales y se condenó a Longoria. Nos negamos a revisarlas (R-78-286 y 288) el 7 de septiembre de 1978.

[5] El licenciado Longoria fue el abogado de Clara Amalia Pérez en el año 1972 en el caso de divorcio Civil #72-2358 contra su esposo Edsel Delerme Martínez en el Tribunal Superior de Mayagüez.

demandante que estaba separado de su esposa. No recordó de cuándo fue la última entrada o anotación en el libro que se le desapareció de su oficina y en el cual llevaba anotado los gastos. Sobre este libro expresó que la última vez que lo vio fue en la fecha anterior en que estuvo señalado el caso, ya que lo trajo al Tribunal y lo regresó a su escritorio y en todos los señalamientos lo traía, pero que no lo trajo esta vez porque no sabía que el caso estuviera señalado. Tampoco lo trajo el segundo día de la vista, porque no lo encontró en su oficina.

El otro testigo, Norberto Quintana, por su parte declaró que conoce a Longoria hace más de 30 años. Que se dedica al comercio y la agricultura. Que le prestó en su casa $60,000 el 18 de julio de 1973 en horas de la tarde, y éste le entregó un pagaré y escritura, habiéndole pagado intereses por el primer año; en diciembre $2,400 e igual cantidad en julio de 1974. Que le había requerido el pago al demandado y éste le dijo que tenía problemas y no podía pagarle. Que le entregó el dinero en efectivo en billetes de diferentes denominaciones, ya que lo tenía en su casa en una caja. Que habían hablado inicialmente del negocio el 4 de julio de 1973 y que éste le había ofrecido en garantía la finca diciéndole que valía de 2 a 3 mil dólares la cuerda, pero que no le pidió tasación. El día 18, al hacer el negocio, Longoria le mostró el poder, siendo la primera vez que le pregunta por su esposa, pero que sabía que tenía problemas matrimoniales.

Al ser interrogado sobre sus ingresos y cuánto pagó en contribuciones atestó que no recordaba lo que ganó ni pagó de contribuciones durante los años 1972, 1973 y 1974; que él firmaba las planillas, las cuales preparaba el contable de acuerdo con la información que le suministraba; que no recordaba si firmó las planillas del 1973 y 1974; que vendió en esos años más o menos $400,000, que no recuerda si informó los intereses en sus planillas, aunque está consciente de que "son ingresos"; y que pagó la planilla de

1973 en dos plazos. Se le pidió que explicara cómo, para el año 1973, pagara sólo $2,505.87 en contribuciones sobre ingresos y ese mismo año pudiera prestar a una persona $60,000, a lo cual respondió que *era muy fácil:* porque los tenía guardados.([6]) Declaró, además, que acostumbraba a prestar dinero y que no le daba la información de los intereses al contable sobre los 3 ó 4 préstamos que hacía al año.

Siguió declarando que el deudor (Longoria) se quedó con la escritura para llevarla a inscribir y que un mes más tarde la recibió registrada, debido a que él le había informado que no la aceptaba.([7]) Que exigió que el pagaré fuera a la presentación para cobrarlo o negociarlo cuando lo necesitara. Que nunca requirió su cobro a la codemandada-recurrente ni tampoco le preguntó a Longoria si le había informado a ella del préstamo.

La codemandada Isabel Vélez, por su parte, presentó su propio testimonio y el de su hija Lcda. Olga Longoria Vélez. La primera, en cuanto a la simulación de fraude, atestó: Que allá para el 18 de julio de 1973, aunque casada con Longoria, no compareció físicamente a otorgar la escritura del pagaré hipotecario de ese día. Que se enteró de su otorgamiento el día 18 de julio de 1975, cuando fue emplazada para el pleito. Que Longoria, al solicitarle el poder, le dijo que era para usarlo en un caso de emergencia que ella no pudiera estar presente, y que *siempre iba a consultarle para ver si estaba de acuerdo con los negocios,* y luego los hacía.

Negó que el 2 ó 3 de julio de 1973 Longoria le informara que debido a unas deudas gananciales iba a hacer

([6])Copia certificada de las planillas de contribución sobre ingresos del demandante fueron presentadas y admitidas en evidencia. Las mismas arrojan que para el año 1973 tuvo ingresos de $15,530.96, y pagó de contribuciones $2,505.87; y para el 1974 informó $20,658.39 y pagó $4,055.34.

([7])Esta aseveración es de dudosa credibilidad debido a que anteriormente había declarado que la transacción se hizo en su casa entre 5 ó 6 de la tarde y de la escritura se desprende que la misma fue presentada al Registro el mismo día 18 de julio de 1973, a las 2:20 de la tarde.

un préstamo a varias personas, entre las cuales estaba el demandante, y que éste le dijera que iba a otorgar un préstamo de $60,000 ó de cualquier otra suma para hacer ciertas mejoras en los bienes gananciales o para cualquier otra índole.

En cuanto a la revocación del poder declaró que Longoria tuvo conocimiento de ello aproximadamente para agosto 4 del 1973. Basó tal aseveración en que recibió la demanda de divorcio ese día y que entonces acudió a su oficina a las 10:35 de la mañana a decirle que había sido emplazada, pero que pronto recibiría la de ella, y que éste entonces le dijo: "yo te lo hice porque tú me revocaste el Poder y aquí tengo la carta del licenciado Tapia" y que luego se metió en la oficina y cerró la puerta tirándola. (T.E., pág. 208.)

Declaró, además, que más o menos el 2 de julio de 1973 habló con Longoria y le dijo que le iba a revocar el poder, porque él estaba haciendo mal uso del mismo, despilfarrando el dinero, ya que se había enterado de que él le iba a comprar una casa a la amante y que estaba haciendo la escritura. Que ante ese señalamiento, el codemandado le respondió que no conseguiría abogado que la representara en contra de él. Que si ese día encuentra un abogado, lo hubiera revocado. Durante varios días estuvo buscando abogado en el área de Mayagüez para revocar el poder y que uno le aconsejó que viniera directamente al Colegio de Abogados; que así lo hizo y el 19 de julio de 1973, a las 12:00 del mediodía la llevaron del Colegio a las oficinas del Bufete Tapia y Avilés. Que ese mismo día el Lcdo. Tapia preparó y otorgó la escritura de revocación del poder. Que Longoria le había dicho que él no tenía deudas y que todo estaba bien y en buenas condiciones y no tenía que preocuparse. Que ella sabía que él tenía dinero suficiente para hacer negocios y no tenía necesidad de cogerlo prestado. Que tampoco le había informado sobre la existencia en su oficina o en algún otro lugar de algún libro o

documento en el cual él tuviera detalladas las operaciones o transacciones que hacía con los bienes gananciales. Que en una ocasión Longoria hizo una venta ficticia a Méndez Santana para obtener un permiso de Planificación y que ella firmó la escritura también; pero que luego se hizo otra vez el traspaso. Que Longoria no cogía dinero prestado. Que no sabe a cuánto asciende el caudal ganancial.

Por su parte la testigo Lcda. Olga Longoria Vélez declaró su condición de hija de los demandados; que durante el tiempo que ha conocido a su padre éste nunca le habló del préstamo de $60,000 con el demandante y que, por el contrario, en el 1971 y después de radicada la demanda de divorcio en 1973, le dijo que no tenía ninguna deuda y que poseía mucho dinero el cual les pertenecía a ellos, y que si alguien reclamaba no había nada de responsabilidad porque no tenía deudas. Que en una ocasión le pidió que intercediera entre su madre y él, para que ésta le diera el divorcio. Que supo del préstamo cuando fue emplazada su madre.

Declaró, además, que aunque entre ella y su padre no había ningún tipo de comunicación, ella no le guardaba rencor, porque sigue siendo su padre. Que ella sabía que su padre tenía mucho dinero en su oficina y que cuando fue a Europa de viaje le dio la combinación de la caja fuerte a su hermano.

La prueba antes relacionada es la única pertinente en cuanto a la controversia sobre simulación o fraude. Su lectura integral nos convence de que el tribunal de instancia actuó correctamente al concluir que en verdad Longoria incurrió en la obligación y que ésta no es una ficticia. Como veremos, el que actuara por motivaciones egoístas, a espaldas de su esposa, para su propio beneficio —perjudicando indirectamente la solvencia de la Sociedad de Gananciales— no destruye la realidad del préstamo, aunque tal proceder acarree otras consecuencias jurídicas. La codemandada-recurrente nos cita nuestros pronunciamien-

tos de *García López* v. *Méndez García,* 102 D.P.R. 383, 386 (1974), sobre el tipo de prueba necesaria en casos en que se alega fraude, a saber, preponderancia de la prueba.

La prueba en unión a la escritura, nos convence con razonable certeza de la ausencia de simulación o fraude, contrario a lo sucedido en *García López,* supra. El demandante Norberto Quintana demostró claramente cómo, cuándo, dónde y bajo qué circunstancias Longoria suscribió la obligación. Aunque el testimonio de Longoria es a veces contradictorio y evasivo, sobre este extremo corroboró lo declarado por aquél. Por otro lado, la declaración de la codemandada Vélez y de su hija se limitaba a señalar que Longoria poseía mucho dinero, que no cogía prestado y que les había confesado que no tenía deudas. Concluimos por tanto, que la obligación es legítima y válida.[8]

## II

*Uso dado al dinero*

El correcto análisis de este segundo aspecto —si el dinero producto del préstamo que tomó Longoria lo invirtió en los bienes gananciales— requiere que dejemos aclarado que según el decreto de divorcio, las partes se separaron definitivamente para finales de septiembre o principios de octubre de 1971 —con posterioridad a la firma del poder general, el 22 de septiembre de 1971— al Longoria abandonar el hogar por serias desavenencias conyugales surgidas debido a que mantenía relaciones

---

[8] Como nota al margen, y en vista de la gran disparidad que, según la prueba, existe entre los ingresos y el monto reportado en las planillas del demandante Norberto Quintana, en virtud de nuestros pronunciamientos en *Suro* v. *E.L.A.,* 111 D.P.R. 456, 460 (1981), procede: "ordenar que se remita al Secretario de Hacienda copia certificada de la opinión y sentencia para que dicho funcionario advenga en conocimiento de tales hechos, y, con arreglo a las disposiciones de ley aplicables, proceda a realizar las gestiones tendentes a cobrar las contribuciones e intereses que procedan", por tratarse de un caso análogo a los allí señalados.

amorosas extramaritales con la señora Clara Amalia Pérez, con la cual después procreó una niña nacida el 22 de diciembre de 1973. "Estos hechos resultaron ser el epílogo y causa efectiva, que dio término a la convivencia marital entre las partes, *la cual como cuestión de hecho se había deteriorado y afectado grandemente por la conducta del Demandante-Demandado Hernán Longoria para con su esposa.* Esta conducta era una de total desamor e indiferencia y abandono de los deberes de esposo para con su cónyuge, a la vez que mantenía una relación amorosa fuera del hogar y la cual al llegar a conocimiento de Doña Isabel Vélez de Longoria y sus hijos, causó o marcó la separación definitiva de las partes." (Énfasis suplido.) (Determinación de hecho Núm. 3, sentencia de divorcio.)

Este trasfondo de grave ruptura en las relaciones físicas y espirituales que como institución humana presupone la estabilidad mínima matrimonial —*Figueroa Ferrer* v. *E.L.A.*, 107 D.PR. 250 (1978) y *García* v. *Montero Saldaña*, 107 D.P.R. 319 (1978)— debió servir de faro iluminador para guiar la apreciación de la ilustrada sala de instancia al determinar si los $60,000 que tomó prestados habían sido invertidos en los bienes gananciales o en otros menesteres exclusivos del codemandado Longoria. Con esta premisa presente examinemos en lo pertinente su testimonio.

Durante el contrainterrogatorio se le pidió que desglosara las inversiones de la partida de $60,000, ante lo cual expresó no tener disponible los números exactos ni las fechas, por lo cual contestaría en términos generales. Explicó que no tenía esa información porque no sabía que el juicio era ese día —creía que era otro caso el que se iba a ventilar— y tales datos se le quedaron en ese otro caso, por haber traído un expediente distinto. En el desglose general declaró que el dinero lo dedicó "*a pagar, arar, desmontar*". Inquirido sobre cuánto gastó en arar contestó que cerca de $6,000 en los terrenos de la finca de La

Parguera —que no estaba en litigio— y que el pago lo hizo a la Administración de Servicios al Agricultor, en *efectivo*. Luego contestó, *"no recuerdo bien, más o menos siete mil dólares, algo así"* (T.E., pág. 47), sin recordar fecha exacta, como tampoco mes y año. Tampoco recordó el tiempo que transcurrió entre la entrega del dinero y ese desembolso, ni lo podía precisar, y que probablemente lo tenía anotado, pero que no lo recordaba.

Siguió atestando que compró *yerba buffer*, que le costó $300 el *quintal* y gastó como $3,000 más o menos en la semilla nada más, aparte del riego. (Serían 10 quintales de yerba.) Esta suma la pagó a "Texas Six" localizada en Houston, Texas. El pago fue por giro bancario sin recordar la fecha. Cree que banco girador fue el de Economías y Préstamos de San Germán. No sabía la dirección de la compañía, ni estaba seguro de poder suministrarla, porque hacía ya mucho tiempo de eso y no había vuelto a comprar. Fue sembrada la parte de atrás de la casa y el monte en La Parguera. No recordó el nombre de la persona en La Parguera que la sembró con sus dos hijos ni la fecha específica ni el año. Sabe que fue en el mes de agosto, porque los meses de julio y agosto son los de siembra. Se sembraron 70 cuerdas de terreno.

Continuó declarando que pagó a Concretera Mayagüezana de $10,000 a $12,000 y que sabía que era de Mayagüez, pero no su dirección. A renglón seguido aclaró que esas cantidades incluyen la mano de obra, la cual cree que fueron "cinco o seis mil pesos, más o menos". (T.E., pág. 50.) El cemento fue usado en una verja de alambre eslabonado (*cyclone fence*) construida con base de cemento en La Parguera. El pago lo hizo en efectivo a "Chiro". No recuerda la fecha como tampoco el nombre y apellido de "Chiro". En el alambre no recuerda cuánto exactamente gastó: "ocho o diez mil pesos", pero no se acuerda. Que ese pago lo hizo a la Administración de Servicios Agrícolas en la Calle Ferrocarril de San Germán. Aclaró que no estaba

seguro de que comprara ese alambre por ocho o diez mil dólares a la Administración, pero sí que lo compró, le costó eso, está puesto y lo puso César Avilés. Que instaló de seis a siete kilómetros de cerca de espeques de acero de seis pies de alto con pelo de alambre —en algunos sitios con cuatro pelos y en otros hasta ocho. No recuerda la fecha ni cuánto le costaron los espeques. Señala que pueden ser 7, 8, 9 ó 10 mil dólares, pero que no recuerda. Declaró que le compró esto a varias personas y señala a Bonini y Compañía, cree que a Norberto Quintana, a Servicios a los Agricultores, le compró un lote; otro a Central San Francisco. Esta última lo tenía como material desechado. No recordó las fechas de estas compras.

Preguntado sobre si todas las cuentas así desglosadas las había hecho con posterioridad al préstamo, contestó: "[a]lgunas las debía y las pagué con el préstamo, otras fueron hechas con posterioridad, no recuerdo exactamente. *Lo que sí sé es que el dinero está invertido, los sesenta mil dólares, en mano de obra, materiales y trabajo.*" (T.E., pág. 55.) Siguió declarando que la información de cuáles pagos fueron hechos antes o después del préstamo probablemente la tenía en la oficina, pero que no estaba seguro y que todo lo tenía allí. Se le preguntó si tenía la información de *cuánto compró* a lo cual contestó "[y]o creo que tengo alguna de esas, las tengo". (T.E., pág. 56.) Señaló que no tenía objeción alguna —si tenía la información— en traerla en la próxima ocasión.

Al reanudarse el proceso después de un fin de semana el tribunal indagó sobre si había conseguido los documentos, desarrollándose el siguiente diálogo:

TESTIGO SR. LONGORIA:

Vuestro honor, tenía un libro de jornales de entrada y salida, libro de aproximadamente ocho pulgadas de ancho por doce pulgadas, quizás más, catorce pulgadas de largo con aproximado una pulgada de grueso donde tenía todas las entradas de todos los gastos hechos en la finca y los estados unidos a esos documentos. . .

. . . . . . . .

R— A cuyo libro estaban unidos otros documentos también relacionados de las fincas y no están en la oficina.

HON. JUEZ:

O sea, que la respuesta es que aquellos documentos a que estaba haciendo referencia, no están disponibles.

TESTIGO SR. LONGORIA:

Desaparecieron de la oficina, vuestro honor.

HON. JUEZ:

Esa es la situación, compañero Avilés.

TESTIGO SR. LONGORIA:

Tengo algunos documentos que los tenía en otra . . . en el maletín en otro sitio y esos están, pero que no son directamente en cuanto a los gastos.

. . . . . . . .

LCDO. AVILÉS RODRÍGUEZ Y TESTIGO SR. LONGORIA:

P— Testigo, ¿en relación con esto, lo que Usted ha hecho referencia, debo entender que los documentos relacionados con los gastos y específicamente esos son los que se han extraviado o han desaparecido?

R— Esos y otros documentos más, desaparecidos.

P— ¿Y se percató de esa ausencia, de esta desaparición, en qué momento, testigo?

R— Me percaté cuando fui del Tribunal a buscar esos documentos que había prometido y busqué en el sitio que estaban, y allí no estaban. Esos documentos estaban en la última gaveta a mano izquierda de mi escritorio donde siempre habían estado. Un escritorio sin llave, allí estuvieron siempre. (T.E., págs. 62 y 63.)

Posteriormente se le preguntó si era cierto o no que la verja del frente hecha de alambre eslabonado y base de cemento había sido hecha antes del año 1969, a lo cual declaró que no era verdad, añadiendo que recordaba específicamente que compró el alambre a International

Agencies y el hierro era de seis pies de alto. (T.E., pág. 72.) Durante el receso del juicio del fin de semana no pudo recordar cuándo se había hecho la verja.

La declaración antes relacionada constituye toda la prueba que tuvo ante sí el tribunal de instancia sobre la alegada inversión por Longoria de los $60,000 en los bienes gananciales. La misma resulta insuficiente. Veamos. Primeramente, aun adjudicándole —para fines de argumentación— absoluta credibilidad y computando las sumas mayores declaradas ($6,000 en arar, $3,000 en yerba, $6,000 en cemento, $10,000 en alambre y $10,000 en espeques) ello arroja sólo un total de gastos ascendentes a $35,000. ¿Qué sucedió con los otros $25,000? El récord se encuentra en total orfandad. Segundo, notamos el testimonio lleno de lagunas, datos imprecisos y vagos. Claramente tal contenido, en lugar de arrojar luz, tiende a debilitarlo. Tercero, la conducta de Longoria, como profesional y persona, es extraña. Para la fecha en que tomó el préstamo las relaciones con su esposa se habían deteriorado y afectado grandemente por su conducta; ya estaban separados. Y cuarto, la confusión inicial y la repentina e inexplicable pérdida de su abultado "libro de jornales de entrada y salida" —precisamente en ocasión del juicio— siendo codemandado, destruye el valor probatorio de su testimonio. Frente a la debilidad de esta prueba, surge el testimonio de la codemandada-recurrente, quien categóricamente declaró que a las propiedades gananciales no se les había hecho ninguna mejora; que ella había visitado la finca con frecuencia y estaba en igual condición que en el año 1973. (T.E., pág. 239.) Específicamente, a preguntas del abogado del codemandado Longoria en torno a cuándo se habían construido las verjas, atestó que la de la casa y finca de La Parguera fueron mucho antes del año 1969, fecha en que se inauguró la casa. Sobre la otra finca no podía decirlo exactamente porque no lo sabía. (T.E., pág. 299.) A preguntas del tribunal aclaró que si bien no

recordaba la fecha en que se realizaron las obras a los diez solares urbanizados, ello fue mucho antes del 1969. Declaró en cuanto a este respecto que ella compareció y firmó las escrituras. (T.E., págs. 314-315.)

Por su parte, la hija, Lcda. Olga Longoria, indicó que las obras hechas en las propiedades fueron en el 1969 ó antes, hecho que conocía, porque en esa época sus padres estaban juntos y ella los visitaba. Que estuvo en la fiesta en que se inauguró la casa de La Parguera. (T.E., págs. 344-345.)

Aunque hemos de reiterar la importancia del principio de respetar las determinaciones de hecho de los tribunales de instancia con apoyo en la prueba, el análisis expuesto nos mueve a apartarnos en el caso de autos. *García* v. *A.F.F.*, 103 D.P.R. 356 (1975); *Ruiz* v. *San Juan Racing Assn.*, 102 D.P.R. 45, 52 (1974); *Prieto* v. *Maryland Casualty Co.*, 98 D.P.R. 594 (1970); *Ortiz Rodríguez* v. *A.F.F.*, 94 D.P.R. 546 (1967); *Maryland Casualty Co.* v. *Quick Const. Corp.*, 90 D.P.R. 329 (1964); y *Sanabria* v. *Sucn. González*, 82 D.P.R. 885 (1961).

 No milita en contra el valor parcial que teóricamente pudiera atribuírsele al testimonio de Longoria en cuanto a la realidad del préstamo hipotecario, el cual está evidenciado en escritura pública y contenido en la declaración del demandante Quintana Tirado. La prueba demuestra y exige distinto resultado en cuanto a la forma en que invirtió el producto de ese préstamo. [9]

---

[9] Bajo un enfoque evidenciario riguroso obsérvese que en *Pueblo* v. *López Rivera*, 102. D.P.R. 359, 365-366 (1974), reconocimos que el faltar un testigo a la verdad en parte de su testimonio no implica necesariamente que deba rechazarse el resto de su declaración. Añadimos, además, que la máxima *falsus in uno, falsus in omnibus*, no autoriza a rechazar toda la declaración de un testigo porque se haya contradicho o faltara a la verdad respecto a uno o más particulares. El principio mayor es que la misión de los tribunales requiere armonizar y analizar en conjunto e integralmente toda la prueba, a los fines de arribar a una conclusión correcta y razonable del peso que ha de concedérsele en su totalidad. *García Rivera* v. *Tribunal Superior*, 86 D.P.R. 823 (1962).

■ Resumiendo, en la situación de autos el análisis de toda la prueba nos convence de que los $60,000 que tomó prestados Longoria a Quintana Tirado no fueron invertidos en los bienes gananciales. ¿Qué consecuencias ello tiene? Frente a Quintana Tirado, como acreedor hipotecario, responde la sociedad legal de gananciales Longoria-Vélez, pero en la dinámica interna y liquidación de dicha sociedad, la misma es de la exclusiva responsabilidad de Longoria.

## III

■ Resta discutir dos señalamientos, uno procesal y otro de naturaleza sustantiva. En cuanto al procesal, la recurrente Vélez señala que el tribunal de instancia omitió resolver su reconvención y la demanda contra coparte. Ciertamente la parte dispositiva de la sentencia no contiene pronunciamiento específico sobre tales demandas, pero su lectura íntegra refleja que fueron declaradas sin lugar. Bajo este último supuesto hemos de decidir la procedencia de las causas de acción deducidas en la referida reconvención y demanda contra coparte, a saber, reclamaciones por daños debido a la conducta de Longoria y reembolso de cánones de arrendamiento dejados de percibir. Un examen minucioso del testimonio de la señora Vélez en cuanto a los alegados daños experimentados por las acciones de Longoria nos persuade de que el Tribunal actuó correctamente al no reconocerlos. Ella sólo declaró en forma general que estaba un poco alterada de los nervios y que tomaba medicamentos. La prueba no es convincente. Tal situación nos parece normal, producto más bien de los sinsabores, inconvenientes y angustias que experimenta una mujer cuyo matrimonio termina en divorcio luego de 27 años y se ve obligada a ir a los tribunales a dilucidar ese fracaso. *Figueroa Ferrer* v. *E.L.A.*, supra. El remedio se traduce en las costas y honorarios. En cuanto al contrato de arrendamiento y su canon, también declaró en

igual forma. Expuso que padecía de una condición "espástica", que le empezó aproximadamente en el año 1976. Las transacciones en cuestión habían sido realizadas en el 1973. (T.E., págs. 217, 229, 320–325.)

Ahora bien, este contrato de arrendamiento efectuado el 21 de agosto de 1973 entre Quintana y Longoria sobre las tres fincas gananciales revela otra dimensión y solución. La recurrente alegó que era nulo por no haber ella comparecido a su otorgamiento, requisito indispensable por tratarse de tres fincas gananciales a ser arrendadas por un término de 15 años con prórroga de cinco y haberse con anterioridad revocado el poder el 19 de julio de 1973. El tribunal a quo acogió la teoría de Longoria de que el arrendamiento había sido rescindido porque Quintana Tirado había sido privado de la posesión de las fincas [10] y no tenía interés en que prevaleciera el mismo. Erró.

■ Dicho contrato no era susceptible de tal pronunciamiento jurídico: no podía ser rescindido, pues solo lo son aquellos contratos específicamente señalados por la ley con carácter de acción excepcional. Art. 1243 del Código Civil, 31 L.P.R.A. sec. 3492; *Municipio* v. *Vidal,* 65 D.P.R. 370 (1945). Como nos advierte Manresa, la rescisión surge *después de la perfección del contrato* y va de afuera hacia dentro, quebrantando la relación jurídica válida y eficaz que existe. *Código Civil Español,* 6ta ed., 1967, T. 8, Vol. II, pág. 771. Castán, *Derecho Civil Español,* 11ma ed., 1974, T. 3, págs. 585, 592. Para la fecha del arrendamiento el poder general había sido previamente revocado. Dados los términos del arrendamiento, era menester, bajo pena de nulidad la comparecencia, consentimiento y firma de la señora Vélez. [11] *Encarnación* v. *Salim,* 69 D.P.R. 766 (1949); *Crehore* v. *El Registrador de Guayama,* 25 D.P.R.

---

[10] Sin embargo, éste declaró que poseía una parte de la finca. (T.E., págs. 431–432.)

[11] Arts. 91 y 1313 del Código Civil, 31 L.P.R.A. secs. 284 y 3672; *Madera* v. *Metropolitan Const. Corp.,* 95 D.P.R. 637 (1967).

847 (1917); *R. Fabián & Co.* v. *El Registrador*, 22 D.P.R. 801 (1915). Repetimos, careciendo el mismo de validez y eficacia no podía rescindirse. Tampoco podía resolverse.

■ Como consecuencia de la nulidad del contrato de arrendamiento, los cánones pagados por el arrendatario durante el tiempo que utilizó las propiedades son frutos gananciales a ser incluidos y acreditados en el procedimiento de liquidación de la sociedad de gananciales.

*Se dictará sentencia que modifique la del tribunal de instancia en los siguientes extremos: que Isabel Vélez tiene un crédito a su favor contra Hernán Longoria por el monto de la obligación hipotecaria ascendente a $60,000, intereses, costas y honorarios devengados e incurridos como consecuencia de la ejecución judicial del pagaré suscrito el 18 de julio de 1973 a favor de Norberto Quintana Tirado; y que los contratos de arrendamiento efectuados el 21 de agosto de 1973 son nulos y los cánones devengados son de carácter ganancial a ser incluidos al liquidarse la sociedad ganancial Longoria-Vélez.* Así modificada, será *confirmada.*

Los Jueces Asociados Señores Díaz Cruz e Irizarry Yunqué no intervinieron.