Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| ILEANA NORAT MOLINA Y OTROS<br><br>*Apelantes*<br><br>v.<br><br>CONDOMINIO ASIA Y OTROS<br><br>*Apelados* | KLAN202400642 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.:<br>SJ2019CV02769 (804)<br><br>Sobre:<br>Caída |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de abril de 2025.

Comparece ante nos, la Sra. Ileana Norat Molina (Sra. Ileana Norat) y la Sra. Carmen Norat Molina (Sra. Carmen Norat) (en conjunto, parte apelante), mediante recurso de *Apelación.* Por medio de este, nos solicita que revisemos la *Sentencia* emitida y notificada el 2 de mayo de 2024, por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI o foro apelado). Mediante el referido dictamen, el foro apelado declaró *No Ha Lugar* la *Demanda* presentada por la parte apelante y, en consecuencia, ordenó el cierre y el archivo de la causa con perjuicio.

Por los fundamentos que expondremos a continuación, se **confirma** la *Sentencia* apelada.

**I.**

El 20 de marzo de 2019, la parte apelante incoó la *Demanda*[1] sobre daños y perjuicios que inició el pleito de autos. En esta, alega que la Sra. Ileana Norat sufrió una caída el 22 de marzo de 2018, cuando salió por la puerta principal del

---

[1] Véase, Apéndice 1 del recurso de *Apelación,* págs. 1-5.

Número Identificador
SEN2025_____

Condominio Asia (Condominio Asia o parte apelada), para dirigirse al exterior del edificio y tener acceso a la acera, después de haber visitado al oftalmólogo Dr. Ernesto Collazo (Oftalmólogo).

La Sra. Ileana Norat arguyó en la *Demanda* y en la *Demanda Enmendada*[2] que había un desnivel entre un pasillo frontal de losas de colores y una acera de cemento del Municipio de San Juan, lo cual provocaba que el pasillo se encontrara a un nivel más alto que la acera, creando un escalón de aproximadamente 3 pulgadas. Así pues, la Sra. Ileana Norat alegó que, debido al desnivel, el cual no era perceptible, sufrió una caída. Es por ello, que reclamó daños y perjuicios por los daños físicos, angustias mentales, gastos de cuido para sus mascotas y gastos médicos. Por su parte, la Sra. Elena Norat reclamó angustias mentales y el reembolso de gastos incurridos debido a los trámites que tuvo que realizar para acompañar a su hermana, la Sra. Ileana Norat, en su recuperación.

El 4 de enero de 2020, la parte apelada presentó su Contestación a *Demanda*[3]. En esta, el Condominio Asia negó la responsabilidad por la caída que sufrió la Sra. Ileana Norat. Su alegación, se fundamentó en que la apelante había acudido al lugar de lo sucedido antes del 22 de marzo de 2018, por un espacio de dieciocho (18) años desde el año 2000, una vez al año, para recibir tratamiento de su Oftalmólogo. Por lo cual, la Sra. Ileana Norat conocía muy bien el área donde sucedió la caída. Igualmente, la parte apelada arguyó que tanto la fachada del edificio como la acera, no habían experimentado algún cambio. Finalmente, adujo que el edificio era uno comercial de varias oficinas médicas donde aproximadamente acudían quinientas (500) personas al mes, donde

---

[2] Véase, Apéndice 1 del recurso de *Apelación*, págs. 1-5 y Apéndice 9 del recurso de *Apelación*, págs. 28-32.
[3] Véase, Apéndice 2 del recurso de *Apelación*, págs. 6-12 y Apéndice 16 del recurso de *Apelación*, págs. 37-40.

la mayoría eran envejecientes, y este era el primer accidente que sucedía.

Luego de varios incidentes procesales, el 12 de octubre de 2022, se celebró la Conferencia con Antelación a Juicio. Surge del *Informe Preliminar Entre Abogados*[4] que la parte apelante arguyó que con relación a la construcción del pasillo que creaba el desnivel, su perito de construcción de accidentes, el Ingeniero Iván O. Hernández Martínez (Ing. Hernández Martínez), hizo un análisis aplicando los Reglamentos que pudieron estar vigentes para la época que construyeron el pasillo que tenía el desnivel[5]. Los reglamentos analizados fueron los siguientes: Reglamento de Edificación #7 vigente desde el 1949 hasta el 31 de diciembre de 1998 (Reglamento de Edificación) y el *Uniformed Building Code* vigente desde el 31 de diciembre de 1998 hasta marzo de 2011 (Uniformed Building Code).

En cuanto al Reglamento de Edificación, *supra,* el Ing. Hernández Martínez indicó que no contenía referencia específica en cuanto a la condición objeto de la controversia. Empero, advirtió que el reglamento hacía alusión a la necesidad de cumplir con requisitos mínimos de seguridad en los medios de salida para garantizar la salud de los usuarios del pasillo. En lo que respecta al *Uniformed Building Code, supra,* el Ing. Hernández Martínez señaló que el mismo contenía referencias a los medios de salidas, que advertían que debían ser de forma continua, sin obstáculos y sin disminuciones desde cualquier punto del edificio hacia la vía pública.

Por su lado, la parte apelada adujo que su perito, Arquitecto Jorge R. Calderón López (Arq. Calderón López), indicó en su *Informe Pericial*[6] que de acuerdo con Google Maps, el Condominio Asia fue

---

[4] Véase, Apéndice 18 del recurso de *Apelación,* págs. 42-70.
[5] Véase, Apéndice 18 del recurso de *Apelación,* págs. 44-45.
[6] Véase, Apéndice 40 del recurso de *Apelación,* págs. 188-200.

construido previo al año 1990. Así pues, concluyó que, el tipo de trabajo realizado en el lugar de los hechos no estaba regulado por el Reglamento de Edificación, *supra*, el cual estaba vigente previo al año 1989. Asimismo, reconoció que el mencionado reglamento no regulaba la acera de losas por donde caminó la Sra. Ileana Norat.

Así las cosas, el juicio se celebró los días 13, 16 y 17 de noviembre de 2023. Por la parte apelante, la prueba testifical consistió en el testimonio de la Sra. Ileana Norat, la Sra. Carmen Norat, el doctor Carlos Grovas Badrena (Dr. Grovas Badrena) y el perito, Ing. Hernández Martínez. El Dr. Grovas Badrena testificó con relación a los daños físicos de la Sra. Ileana Norat, mientras que, el Ing. Hernández Martínez prestó su testimonio para establecer que el lugar donde ocurrió la caída no cumplió con los códigos de construcción.

Por la parte apelada, declaró el Arq. Calderón López, el cual arguyó que el desnivel por donde cayó la Sra. Ileana Norat Molina no incumplía con el Reglamento de Edificación, *supra*, pues no lo regulaba y tampoco constituía una condición peligrosa. Igualmente, testificó el Sr. Neftalí Cintrón Báez, representante y administrador del Condominio Asia.

En relación con la prueba documental de la parte apelante, se admitió lo siguiente:

- Exhibit 1: Curriculum Vitae del Dr. Carlos Grovas Badrena. (Sumac 99, anejo 8).

- Exhibit 2: Expediente médico certificado del Hospital Pavía, cirugía efectuada a la demandante de 4 de abril de 2018. (Sumac 99, anejo 2).

- Exhibit 3: Lectura de placa de 22 de marzo de 2018 de Pavía Breast & Imaging Center. (Sumac 100, anejo 2).

- Exhibit 4: Expediente médico certificado de sala de emergencias del Hospital del Maestro de 24 de marzo de 2018. (Sumac 99, anejo 3).

- Exhibit 5: Expediente médico certificado de Sala de Emergencias del Hospital Pavía de 22 de marzo de 2018. (Sumac 99, anejo 1).

• Exhibit 6: Certificado Médico del Dr. Raúl Rivera Arias de 29 de agosto de 2018. (Sumac 99, anejo 4).

• Exhibit 7: Hoja de instrucciones generales para facturas del Hospital Pavía de 22 de marzo de 2018. (Sumac 100, anejo 1).

• Exhibit 8: Expediente médico de terapias físicas recibidas por la demandante, récord #32492 de 28 de mayo de 2018. (Sumac 99, anejo 5).

• Exhibit 9: Informe pericial del Dr. Carlos Grovas Badrena. (Sumac 99, anejo 6).

• Exhibit 10: Récord médico de la demandante de la oficina del Dr. Raúl Roura. (Sumac 100, anejo 4).

• Exhibit 11: Declaración jurada sobre certificación de récords médicos de Madeline Rosado Flores, Rosana García Frías y Raúl Roura Arias, y citación de la Sra. Ivette Rivera. (Sumac 100, anejo 13).

• Exhibit 12: Fotos ilustradas del pie y tobillo derecho de diferentes etapas del tratamiento. (Sumac 100, anejo 10).

• Exhibit 13: Fotos del edificio y lugar del accidente. (Sumac 100, anejo 12).

• Exhibit 14: Informe de gastos confeccionado por la codemandante Carmen Elena Norat Molina. (Sumac 100, anejo 11).

• Exhibit 15 (A): Evidencia de estado de cuenta American Express codemandante Carmen Elena Norat Molina mayo 2018. (Sumac 100, anejo 5).

• Exhibit 15 (B): Evidencia de estado de cuenta American Express codemandante Carmen Elena Norat Molina junio 2018. (Sumac 100, anejo 6).

• Exhibit 15 (C): Evidencia de estado de cuenta American Express codemandante Carmen Elena Norat Molina julio 2018. (Sumac 100, anejo 7).

• Exhibit 15 (D): Evidencia de estado de cuenta American Express codemandante Carmen Elena Norat Molina agosto 2018. (Sumac 100, anejo 8).

• Exhibit 15 (E): Evidencia de estado de cuenta American Express codemandante Carmen Elena Norat Molina septiembre 2018. (Sumac 100, anejo 9).

• Exhibit 16: Facturas de Brondo's Grooming & Services, Canela. (Sumac 100, anejo 10).

• Exhibit 17: Facturas de Brondo's Grooming & Services, Nino. (Sumac 109).

• Exhibit 18: Curriculum Vitae del Ingeniero Iván Hernández. (Sumac 99, anejo 7).

• Exhibit 19: Informe pericial del Ingeniero Iván Hernández. (Sumac 103)[7].

---

[7] Véase, Apéndice 29 del recurso de *Apelación*, págs. 93-94.

Mientras que, por parte del Condominio Asia se admitió la siguiente prueba documental: Exhibit 1: Curriculum Vitae del Arq. Jorge Calderón López. (Sumac 97) y Exhibit 2: Informe pericial del Arq. Jorge Calderón López. (Sumac 97)[8].

Evaluada la prueba testifical y documental, el 2 de mayo de 2024[9], el TPI emitió una *Sentencia*[10] en la que pronunció las siguientes determinaciones de hechos:

1. Las partes demandantes son las hermanas Ileana y Carmen Elena Norat Molina, vecinas de San Juan, Puerto Rico.

2. La Junta de Condómines del Condominio Asia son los propietarios y administradores del Condominio Asia localizado en la Calle Asia 1503, San Juan, Puerto Rico, donde ocurrió el accidente motivo de la demanda.

3. La Asociación de Garantías de Seguros Misceláneos es la sucesora en interés de Real Legacy Assurance Company, en virtud del proceso de liquidación ante el Comisionado de Seguros.

4. Las partes estipularon que para la fecha de los hechos existía una póliza emitida por Real Legacy Assurance Inc.

5. La codemandante Ileana Norat Molina tiene una maestría en Administración de Empresas, actualmente está retirada. El 22 de marzo de 2018, ésta visitó el Condominio Asia en Santurce, Puerto Rico, para asistir a una cita con su oftalmólogo, Dr. Ernesto Collazo. La señora Ileana visita dicha oficina desde el año 2000 y no ha regresado desde que comenzó la pandemia, aproximadamente en marzo del 2020.

6. La codemandante Ileana Norat Molina testificó que se estacionó en el estacionamiento multipisos del Hospital Pavía que ubica frente al Condominio Asia. Una vez salió del edificio de estacionamiento, cruzó la calle para acceder a la acera frente al Condominio Asia. Indicó que el Condominio Asia tiene dos rampas de impedidos a cada extremo del edificio que acceden desde la acera al pasillo de losas frente al edificio. Indicó que acostumbraba a tomar la rampa que está frente a la puerta principal en el lado izquierdo del edificio desde una perspectiva frontal. El día de la caída, la demandante tomó la rampa de la izquierda para acceder al edificio, sin confrontar problema alguno. A la salida, luego de su cita, indicó que cuando salía por la puerta se dispuso a salir por la misma rampa que entró, pero había personas allí, por lo que tomó el pasillo de losas y, como a mitad de éste sin llegar a la otra rampa, accedió a la acera y sufrió la caída.

7. El Exhibit 13 de la parte demandante muestra una foto del lugar de los hechos. (Sumac 100, anejo 12). Aunque no se puede apreciar la totalidad de la fachada, la foto representa la puerta principal que da acceso al edificio la cual está al extremo izquierdo de la foto. Para acceder al

---

[8] *Íd.*, pág. 94.
[9] Notificada en igual fecha.
[10] Véase, Apéndice 29 del recurso de *Apelación,* págs. 91-120.

edificio desde la acera existe una rampa pintada de color azul, la cual accede a un área de losas color terracota y a su vez accede directamente y de frente a la puerta principal. Esa es la entrada por la que la codemandante Ileana accedió al edificio y por la que conforme a su testimonio, siempre utilizaba al salir del mismo.

8. De esta foto también se puede observar que el edificio tiene un pasillo de losas color terracota ubicado de manera paralela a la acera. La acera tiene el color natural del cemento, mucho más claro y de evidente demarcación. Ambas superficies son claramente distinguibles, una y de la otra, tanto por el color, así como por el material. Entre una y otra superficie hay instalados, de manera vertical, unos tubos blancos que también demarcan las dos superficies. De esa foto se ve claramente el pequeño escalón al que la demandante le llama "desnivel". (Sumac 100, anejo 12).

9. La codemandante Ileana Norat Molina, admitió que había dos accesos de rampa pero que no tomó uno de ellos porque había personas allí. No explicó la razón por la que tampoco utilizó la otra rampa. Indicó que se dirigió a la acera como a mitad del pasillo de losas y que ella percibió que estaba al mismo nivel de la acera. Indicó que tuvo una caída aparatosa, cayó contra su lado derecho del cuerpo, "los zapatos volaron", "la cartera voló ... sentí un ruidito como que algo se partió". En eso, una persona que identificó como técnica del laboratorio cercano la socorrió y le dio un "pad" de alcohol y en tres minutos vino la escolta de emergencia. Expuso que su tobillo derecho "daba vuelta de lado a lado" y tenía un dolor que describió como inmensurable. De ahí la llevaron a la sala de emergencias del Hospital Pavía donde, luego de tomarle los datos, le administraron percocet para el dolor, le hicieron estudios radiológicos y le manipularon el tobillo.

10. La codemandante, Ileana Norat Molina admitió en el contrainterrogatorio que el pasillo por el que caminaba en el Condominio Asia era de un color terracota, distinto al color de la acera, la cual era más clara color "cemento". (Véase Exhibit 13 parte demandante, Sumac 100 y Exhibit 19, parte demandante, fotos, informe pericial del ingeniero Iván Fernández, Sumac 103, págs. 9-12).

11. La señora Ileana Norat Molina testificó convincentemente que ese episodio fue bien doloroso porque le manipularon el tobillo y se lo inmovilizaron. Le diagnosticaron doble [fractura] del tobillo y la refirieron a un ortopeda.

12. La codemandante Ileana Norat Molina hizo cita con el Dr. Roura, ortopeda, quien le operó el tobillo derecho el 4 de abril de 2018, 13 días posterior a la caída. La señora Ileana describió el dolor como irresistible e intolerable, antes y después de la cirugía.

13. El Exhibit 12, parte demandante, muestra la condición de Ileana Norat Molina antes y después de la operación. (Sumac 100, anejo 10). La primera y segunda foto muestran el pie derecho hinchado con hematomas el día de la primera visita al Dr. Roura. La tercera foto muestra la primera visita al Dr. Roura, luego de la operación en la cual se muestra la inmovilización de su pie derecho enyesado. La cuarta y quinta foto muestran el pie de forma lateral y se puede observar que el yeso tiene una abertura vertical que muestra la herida de la Sra. Ileana. Las fotos 6-11 muestran el pie derecho por ambos lados, sin el yeso, en el cual se observa

las cicatrices de la operación a cada lado del pie. Se puede observar el proceso de hinchazón, hematomas, sanación, las grapas y las cicatrices de la operación. La foto 12 muestra una regla en la que se observa una de las heridas, ya cicatrizada, de aproximadamente 3 pulgadas. La foto 13 y 14 muestran el mismo pie hacia el lado opuesto en el cual se observa una cicatriz y una regla que marca casi 4 1/2 pulgadas de longitud. La señora Ileana Norat Molina testificó llorosa, que fue un proceso irresistible y un dolor intolerable. Describió el proceso como uno traumático, quedando con dos cicatrices que no tenía antes.

14. Como parte del proceso post operatorio, hubo que enyesar su pierna. Ese proceso fue muy doloroso y traumático para la Ileana Norat Molina porque la asistente del médico se mostró insegura en el manejo de la sierra que utilizó para abrir unos huecos en el yeso. (Véase Exhibit 12, parte demandante, Sumac 100).

15. Desde la caída a la fecha de la operación transcurrieron 13 días de inmovilización y fuerte dolor. No podía tomar percocet porque tuvo una reacción adversa al medicamento, ya que es alérgica a la aspirina.

16. Ileana Norat Molina residía con quien en ese momento era su compañero de vida y esposo por cuatro años. Aclaró que, aunque tenían una relación de pareja, no vivían juntos todo el tiempo. Ante su situación e inmovilidad, no podía contar con su asistencia ya que éste tenía otras condiciones médicas que se lo impedían. Su esposo se mudó con la hija de éste a Orlando, Florida, Estados Unidos, por su condición de salud y principios de Alzheimer. Ante esta situación, Ileana llamó a su hermana, Carmen Elena, quien vivía en Nassau, Bahamas[,] y le expuso la situación, pues no se podía valer por sí misma ni podía atender a sus mascotas: Nino y Canela.

17. Ante la situación, Carmen Elena viajó de inmediato a Puerto Rico para asistir a su hermana y estuvo con ella a cargo de toda su recuperación.

18. Ileana y Carmen Elena son hermanas y tienen una relación muy estrecha. Más que filial, tienen una relación íntima de amistad que ha perdurado toda la vida. Ambas testificaron sobre el amor que se tienen una a la otra y el valor de dicha relación.

19. La codemandante Ileana Norat Molina expuso que sus perros, Nino y Canela, son parte de su familia y han sido sus acompañantes por 12 años. A consecuencia de la caída, no podía valerse por sí misma ni atenderlos, por lo que tuvieron que incurrir en gastos de cuido para ellos durante su tiempo de recuperación.

20. Luego de la operación y de removerle la inmovilización o cástula, Ileana Norat Molina no podía caminar por sí y tuvo que utilizar un sillón de ruedas y luego un andador el cual estuvo utilizando alrededor de seis meses, desde marzo a octubre de 2018. Estuvo tres semanas con la cástula. La codemandante Ileana tiene una cicatriz exterior permanente a causa de la caída y operación de cuatro y media pulgadas y una cicatriz interior más pequeña de alrededor de tres pulgadas.

21. La codemandante Ileana Norat Molina tuvo que tomar terapias con un fisiatra, las que comenzaron el 2 de mayo de

2018. Recibió un total de 10 terapias ordenadas por el Dr. Roura. Confrontada en el interrogatorio con el Exhibit 8 de la parte demandante, expediente de terapias, Ileana aceptó que le habían indicado que si sentía dolor regresara a la oficina, pero que no lo hizo porque se fue a Bahamas a casa de su hermana. Considerando que su hermana había viajado desde su residencia en las Bahamas ante la emergencia y que no podía valerse por sí, Ileana decidió irse con su hermana a las Bahamas mientras terminaba su rehabilitación. Las demandantes consultaron con su fisiatra para asesorarse de cómo podían continuar terapias en las Bahamas. La terapista que le atendió le dio una hoja de ejercicios que podía realizar por su cuenta, los cuales hizo. Posteriormente, en Bahamas la demandante recibió 10 terapias adicionales, las cuales no fueron recetadas por médicos o terapistas. Estas consistieron en ejercicios de balance y equilibrio y uso de bandas elásticas. Su hermana le dio las terapias luego de adquirir un equipo especial. Las terapias consistían en una técnica de ultrasonidos y electrodos con unas máquinas especiales que adquirieron a través de internet por Amazon.

22. La señora Ileana Norat Molina permaneció en Bahamas desde el 30 de mayo hasta finales de agosto de 2018. Esta testificó que luego del tratamiento no se siente igual que antes. Tiene rigidez en el tobillo, no puede subir escaleras sin apoyo o asistencia de otra persona, ni caminar distancias largas debido al dolor que experimenta. Tiene una parte del tobillo que se manifiesta siempre hinchada y las temperaturas altas o muy bajas le causan molestia. Al día de hoy, indicó que el dolor es el mismo: "inmensurable" y siempre ha sentido dolor. El dolor varía dependiendo de la actividad física. Su movilidad no es la misma y debido a la rigidez tiene que guiar con mucha precaución. Estuvo utilizando, alternadamente, sillón de ruedas y andador hasta octubre de 2018.

23. Luego de la caída y operación, tiene que utilizar dos tamaños diferentes de zapatos: uno para cada pie. Su tamaño normal era número 6 y ahora su pie derecho es número 8. Esto ha implicado un gasto adicional e incomodidad, ya que tiene que comprar dos pares de zapatos de diferentes tamaños, uno para cada pie.

24. Para la codemandante Ileana, luego de la caída su vida cambió por completo y tuvo un impacto emocional. No puede hacer las cosas que hacía antes, como subir aceras, subirse a la cama, tiene temor constante de caerse y experimenta un dolor constante. No puede utilizar zapatos de moda o de taco. Solo puede utilizar zapatillas deportivas (tennis). En el contrainterrogatorio admitió que desde antes del accidente no usa zapatos de tacón alto. Indicó además que, aunque puede guiar, tiene que colocar el asiento bien cerca del guía y acelera utilizando la mitad de su pie hacia el talón. En cuanto a su estado emocional indicó que aún tiene un impacto significativo y que el hecho de tener que ver las fotografías y recordar todo el proceso doloroso que pasó puede decir que tiene "huellas tangibles" del accidente porque puede ver las cicatrices en su pie.

25. En relación con el efecto adverso del [medicamento] percocet, la señora Ileana admitió que éste fue recetado en el Hospital Pavía por uno de los médicos, a pesar de que ella había indicado que era alérgica a la aspirina.

26. La codemandante Ileana Norat Molina, tenía condiciones preexistentes de fibromialgia y artritis reumatoide.

27. La codemandante Ileana Norat Molina reconoció en el contrainterrogatorio que el desnivel con el cual tropezó y causó la caída, se veía del ángulo de frente ante la foto que le mostraron. Sin embargo, declaró que ella siempre accedía y salía del edificio por la rampa de impedidos. En el redirecto expresó que el día del accidente, al salir del edificio, da la impresión de que ambos pisos están al mismo nivel, por lo que el desnivel era "imperceptible" para ella. Por otra parte, admitió que visitaba dicho edificio una vez [al] año para su cita, durante los pasados 18 años previo a la caída.

28. De todas las fotos admitidas en evidencia que reflejan el lugar de los hechos, surge evidentemente que existe un pequeño escalón que la demandante llama desnivel y que el mismo es perceptible en todas las fotos. Además, surge que existe una diferencia en material y color entre una superficie y otra y que el desnivel está salvado a ambos extremos de del pasillo por rampas de impedidos pintadas de azul. Aunque no existe aviso de la existencia de escalón o desnivel, existen unos tubos instalados verticalmente a lo largo del pasillo entre éste y la acera que demarcan las dos superficies.

29. La codemandante Carmen Elena Norat Molina, (en adelante, Carmen Elena) está retirada y reside en Nassau, Bahamas.

30. El 22 de marzo de 2018, Carmen Elena recibió una llamada telefónica de su hermana Ileana, en la que le informó sobre su caída, su condición de que no podía caminar y el intenso dolor que tenía. De inmediato, Carmen Elena tomó la decisión de viajar a Puerto Rico para asistir a su hermana, quien no tenía ayuda. Al día siguiente, Carmen Elena llegó a Puerto Rico. De inmediato, realizó gestiones para conseguir una silla de ruedas para Ileana y contactó a la empleada de limpieza de ésta para que le ayudara. Sobre su relación filial, testificó que Ileana es más que su hermana, es su amiga y confidente. Tienen una relación bien estrecha.

31. Al llegar a Puerto Rico, Carmen Elena realizó gestiones para cuido de las mascotas de Ileana, ya que el apartamento en el que vivía ésta era pequeño. El espacio para deambular en silla de ruedas y asistir a su hermana era limitado. Además, no podía cuidar de las mascotas porque la asistencia a su hermana le tomaba todo el tiempo, por ello decidió que era imprescindible conseguir un cuido para las mascotas. Carmen Elena se encargó de comprar todo lo necesario para el aseo personal, cuido y alimentación de Ileana.

32. Carmen Elena testificó cómo fueron esos días para su hermana. Expuso que Ileana estaba con mucho dolor y cuando se vieron se descontroló emocionalmente y explotó en llanto, soltando todo el dolor y el susto. Al día siguiente, Ileana mostró efectos secundarios del [medicamento] para el dolor, por lo que la trasladó al Hospital del Maestro con síntomas de náuseas y vómitos y fuera de sí. Testificó que Ileana estaba incoherente y hasta le mordió un dedo. Se le diagnosticó una reacción adversa al percocet y le administraron ultracet. La demandante Ileana reconoció en su contrainterrogatorio que quien le recetó el percocet fue un médico en el Hospital Pavía, a pesar de ésta haber dicho que era alérgica a la aspirina.

33. Desde el 23 de marzo al 4 de abril de 2018, fecha de la operación, Carmen Elena testificó que fueron días bien difíciles porque ella manifestaba mucho dolor constante, aún con los medicamentos. Carmen Elena se encargó en ese periodo de tiempo de asistirla 24 horas al día con todas sus necesidades. Le administraba los medicamentos, la llevaba al baño, la aseaba y le hacía compañía ante el desvelo de ambas que no podían conciliar el sueño. Cuando Ileana lograba dormir por "el cansancio del dolor" era el momento en que Carmen Elena podía descansar por primera vez. Informó que ella también tiene fibromialgia por lo que no estaba óptima, pero disimulaba para que Ileana no se preocupara. Pudo percibir que su hermana tenía mucho dolor y angustia, tenía un moretón en su brazo derecho, cadera y pie derecho.

34. Luego de la operación el 4 de marzo de 2018, Ileana experimentó mucho dolor. El manejo para su aseo fue difícil porque le daba pánico lastimarla, recurrió a bañarla con "wipes" o toallitas desechables. Para el manejo de Ileana con su silla de ruedas hubo que sacar la puerta del baño y adquirir equipo especial para poder asearla. Una vez le quitaron la cástula y le instruyeron a caminar, Ileana sintió mucho pánico de lastimarse. Fue muy difícil por el dolor que experimentaba. Carmen Elena se ocupó de llevarla a las terapias con el fisiatra, movilizarla en silla de ruedas y atender por completo por 24 horas diarias a Ileana quien no podía valerse por sí misma. Carmen Elena testificó sobre las dificultades que afrontaba para llevar a Ileana a las terapias. El proceso de acceder en el auto y hasta cargar el sillón de ruedas era algo complicado para ambas. Carmen Elena pagó los deducibles de las 10 terapias que Ileana recibió en Puerto Rico, así como la silla de ruedas.

35. Luego de culminar las terapias, Carmen Elena e Ileana decidieron que lo mejor era trasladarse a Nassau ya que Carmen Elena había estado por espacio de dos meses en Puerto Rico y tenía que atender su hogar. Una vez en Nassau, Carmen Elena se asesoró con personal médico y decidió comprar un equipo para ella misma continuarle las terapias a su hermana. Recibió 10 terapias adicionales, que, aunque no estaban ordenadas por médico alguno, entendieron era de beneficio para Ileana.

36. Carmen Elena pagó en efectivo varias facturas médicas relacionadas al tratamiento de su hermana. (Véase Exhibits 6, 8 y 16 de la parte demandante, Sumac 99 y 100).

37. Entre los gastos médicos cubiertos por Carmen Elena se encuentran los deducibles pagados al ortopeda Dr. Raúl Roura por la cantidad de $150.00 más tres pagos de $8.00 para un total de $174.00.

38. Carmen Elena incurrió en gastos de $223.00 y $20.07 por concepto de zapatos y medias para un total de $243.07. En gastos de terapia física la codemandante Carmen Elena pagó durante el mes de mayo 10 terapias a un costo de $40.00 cada una, más $40.00 adicionales por visita de seguimiento al fisiatra para un total de $440.00.

39. En relación con el cuido de las mascotas, Carmen Elena incurrió en gastos de $1,630.00 por cada uno para un total de $3,260.00. (Exhibit 16 y 17, parte demandante, Sumac 100 y 109).

40. Con relación a los equipos adquiridos en Amazon para continuar terapias por su cuenta el costo fue de $241.44. Sin embargo, estas terapias no fueron ordenadas por el fisiatra o ningún otro médico.

41. En gastos de farmacia, silla de ruedas, andador, silla de baño, artículos de aseo personal y médico, se incurrió en $1,008.63.

42.El costo del pasaje de la codemandante Carmen Elena para llegar a Puerto Rico a asistir a su hermana en marzo de 2018 fue de $566.44, más el de regreso a su hogar para el 30 de mayo de 2018 a un costo de $613.76. Aunque Carmen Elena e Ileana viajaron posteriormente a Bahamas y Carmen Elena sufragó el pago de los billetes de avión, se determina por el Tribunal que éstos no eran imprescindibles.

43. Carmen Elena pagó la mayoría de estos gastos con su tarjeta American Express de una cuenta que comparte con su esposo, Roberto Crespo. Los demás fueron en efectivo. El estado de cuenta divide entre los gastos de Carmen Elena y de Roberto por tratarse de dos tarjetas diferentes con diferente numeración. Carmen Elena, quien tiene un grado en contabilidad y trabajó en la industria bancaria hasta su retiro, testificó que es su costumbre revisar los estados de cuenta constantemente y que una vez corrobora que el gasto esté correcto en la cuenta por la aplicación digital de American Express, deshecha los recibos. Su testimonio convenció al Tribunal. (Exhibit 15, parte demandante, Sumac 100 y 105).

44. En cuanto a su estado emocional, Carmen Elena testificó que fueron días difíciles en los que reprimió muchas emociones, muchos dolores propios de su condición porque no quería que su hermana sufriera por ella. Cuando regresó a su hogar se sentía muy ansiosa, se sentía mal. Añadió que se encargó de su hermana por el amor que se tienen y porque su hermana estaba sola e indefensa sufriendo de dolor y sin poder moverse. Fue un gesto de amor, sin embargo, también fue una angustia y sufrimiento para ella.

45. El doctor Carlos Grovas Badrena es cirujano ortopeda por espacio de 40 años con una especialidad en ortopedia y subespecialidad en cirugía de articulaciones artríticas. Durante 9 años ha sido profesor en la Escuela de Medicina de la Universidad de Puerto Rico y cuenta con licencia activa para ejercer la medicina en New York, Ohio y Puerto Rico. Es miembro de la Asociación Médica Americana, Asociación Médica de Puerto Rico, entre otras. Fue calificado como perito de la parte demandante con especialidad en ortopedia y evaluador médico independiente. (Véase curriculum vitae, Exhibit 1, parte demandante, Sumac 99).

46. El Dr. Grovas Badrena evaluó a la codemandante, Ileana Norat Molina el 27 de agosto de 2019 y rindió un informe pericial. (Exhibit 2, parte demandante, Sumac 99). El perito evaluó físicamente a la demandante y evaluó los expedientes médicos de sala de emergencia del Hospital Pavía, los expedientes de las terapias, expediente médico de la oficina del Dr. Roura, así como la demanda de este caso a los fines de rendir su opinión pericial. Indicó en el contrainterrogatorio, que una semana previa a su testimonio volvió a evaluar a la demandante y se sostiene en su informe pericial.

47. El Dr. Grovas Badrena testificó que evaluó el historial previo de la demandante, quien tenía 61 años y de donde surge que ésta padecía de diabetes, artritis y fibromialgia. La demandante sufrió un esguince de inversión en su tobillo derecho lo que provocó una fractura bimaleolar (fractura oblicua de fíbula distal, fractura maléolo posterior) y dislocación posterior del talo. El remedio inmediato en sala de emergencia fue el correcto, el cual consiste en halar el tobillo para que caiga en su sitio. La dislocación es un asunto de emergencia y produce gran dolor. El doctor mostró una pieza que simula el tobillo y el hueso para demostrar al Tribunal la dislocación. Los estudios radiológicos en sala de emergencia revelaron una dislocación reducida, se le inmovilizó y se le refirió a un ortopeda. Se trata de una fractura bimaleolar. (Exhibit 3, parte demandante, Sumac 99).

48. Relató sobre la operación a la que fue sometida la demandante el 4 de abril de 2018. Indicó que se trataba de una reducción abierta y fijación interna del tobillo. (Exhibit 5, parte demandante, Sumac 99).

49. Obra en autos el expediente médico del Dr. Roura relacionado a la operación. (Exhibit 6, parte demandante, Sumac 99). Del mismo se desprende que la operación consistió en reducir la fractura de físula y maléolo con tornillos y se inmovilizó. A la demandante se le adaptó una placa metálica con 9 tornillos, redujo el maléolo medio con un tornillo y se enyesó. Luego recibió 10 terapias con su fisiatra y se recomendó reposo. (Exhibit 7, parte demandante, Sumac 100).

50. La operación consistió en 9 perforaciones en la fíbula para poner los tornillos y otra perforación detrás en el hueso interno. Indicó que el procedimiento es sumamente doloroso. La demandante se fracturó las dos estructuras del tobillo, lo cual además impacta los ligamentos. Los tejidos blandos que se desgarran vuelven a su lugar anatómico post operatorio y brinda rigidez, por eso es por lo que la paciente tiene que recibir las terapias.

51. A base de su evaluación, el Dr. Grovas Badrena determinó que la demandante tenía un 50% de rango de movimiento activo en el tobillo derecho afectado por la caída. Estableció la relación causal entre la caída y la fractura del tobillo. Determinó un 10% de impedimento en la extremidad inferior derecha, lo cual se traduce en su opinión, en un 4% de impedimento de sus funciones generales, según la sexta edición de las Guías de la Asociación Médica Americana. En cuanto a la prognosis, indicó que esto resulta en una condición permanente para la demandante que no va a mejorar con tratamiento médico adicional.

52. Grovas Badrena descartó que la condición actual de su tobillo derecho se deba a una condición prexistente como la artritis, ya que ello no se había reflejado antes en esa parte del cuerpo. El testimonio pericial del Dr. Grovas Badrena mereció la credibilidad del Tribunal con relación a los daños y no fue refutado.

53. El ingeniero Iván Omar Hernández Martínez es ingeniero civil y sicólogo clínico. Actualmente trabaja como consultor en ingeniería. Obtuvo su grado de ingeniero en la Universidad de Puerto Rico, Recinto de Mayagüez[,] en el año 1969. Trabajó en la industria privada y gubernamental en la Autoridad de Edificios Públicos, Administración de Terrenos,

Administración de Corrección, Compañía de Fomento Industrial, entre otros. Tiene experiencia en construcción de edificios, urbanizaciones, fábricas y hoteles, entre otros. Tiene experiencia en reconstrucción de accidentes y caídas y ha fungido como perito previamente. (Exhibit 18, parte demandante, Sumac 99).

54. El Ing. Hernández Martínez tiene número de licencia de ingeniero 5849. Fue certificado por el Tribunal como perito de la parte demandante en el área de ingeniería. Rindió un informe pericial el 21 de mayo de 2021 sobre los hechos del caso. (Exhibit 19, parte demandante, Sumac 103).

55. El Ing. Hernández Martínez indicó que conocía el lugar de los hechos porque había visitado oficinas médicas previamente allí. No obstante, para efectos de su encomienda visitó el lugar nuevamente. Describió el mismo como un lugar en el cual hay dos aceras, la privada y la municipal. Entre éstas existe un desnivel entre pulgada y media "hasta 3 pulgadas" de altura. Indicó que cuando uno va "de entrada", es decir, de frente al edificio, "es más fácil verlo", refiriéndose al desnivel. De salida no se percibe, según la descripción del perito. El perito explicó que da la impresión de un cambio de piso y no de nivel. Indicó que ese desnivel es violatorio de los Códigos de Construcción y del Reglamento de Edificación de Puerto Rico, también llamado Reglamento de Planificación, número 7, aunque admitió que cuando hizo su evaluación se desconocía la fecha en que el edificio y su acera privada había sido construida. Expuso que los códigos indican que no puede haber un escalón de media pulgada en la salida horizontal. Se refirió a su informe a la foto 8. (Exhibit 19, parte demandante, Sumac 103).

56. Del informe surge que de acuerdo con la inspección ocular que realizó constató que: "Del edificio se sale hacia una acera que es parte del predio. Esa acera interior es de un largo de aproximadamente 60 pies y un ancho de 7 pies con dos pulgadas. Su altura con relación a la acera pública varía entre 2 a 3 pulgadas. Su superficie está cubierta de losetas." (Exhibit 19, parte demandante, Sumac 103).

57. En su informe el perito de la parte demandante concluyó que:
Opinamos que, de acuerdo a lo dispuesto en los Reglamentos de Edificación con posible aplicación para este caso, el pequeño desnivel existente entre la acera pública y la acera con losetas con cerámica del condominio está en incumplimiento con los mismos. El desnivel de entre 2 ½" a 2 ¾" (foto 7) es muy pequeño para poder ser identificado por los usuarios del lugar y evitar así el riesgo de caídas, como el sufrido por la Sra. Norat Molina. La limitada altura del escalón creado por la acera de losas crea la ilusión visual de que éste se encuentra al nivel de la acera revestida. Refiérase a la foto 8. Entonces, concluimos que, si el área de la acera con terminación de losetas de cerámica de la entrada principal del Condominio Asia hubiese estado en cumplimiento con la reglamentación citada, la demandante hubiese podido cruzar entre ambas aceras con seguridad y sin peligros que atentaran contra su seguridad, salud y bienestar, lo que hubiese evitado el accidente. Es decir, el pequeño escalón constituye una condición peligrosa que fue la causante del accidente sufrido por la demandante Sra. Ileana Norat Molina Norat Molina.

58. Conforme el testimonio del perito de la parte demandante, el Reglamento de Edificación de Puerto Rico,

Reglamento de Planificación número 7, estuvo vigente desde 1968 al 31 de diciembre de 1998. Posterior a ello, el Reglamento vigente era el Uniform Building Code de 1998, el cual estuvo vigente desde el 31 de diciembre de 1998 hasta marzo de 2011. En cuanto a la reglamentación aplicable al caso, el testimonio del perito de la parte demandante fue impreciso y en ocasiones contradictorio.

59. El ingeniero Hernández [Martínez] admitió en su testimonio, y así surge del informe pericial que redactó, que el Reglamento de Edificación "...no dispone de referencia específica a este tipo de condición en particular", refiriéndose al desnivel. El perito, por otra parte, citó varias partes de este que hacen alusión a la seguridad de las personas en cuanto a edificios de esa fecha de construcción. A base de ello, su conclusión fue que "el pequeño e imperceptible desnivel existente entre la acera pública y la acera del condominio están en contra del espíritu de este reglamento para garantizar y preservar la salud, seguridad y bienestar de sus usuarios". Añadió que no existe aviso o advertencia de escalón y que el lugar crea la impresión visual de que el pasillo de losas está al mismo nivel que la acera exterior.

60. En el contrainterrogatorio el ingeniero perito de la parte demandante admitió que desconoce el año de construcción del edificio y del pasillo en controversia que identificó como "acera interior". Sin embargo, indicó que debió ser a principios del año 1970. Admitió además que en su informe se hacen comentarios generales. Aclaró que, por otra parte, el Reglamento de Edificación, Artículo III- E- 6.0 sobre salidas horizontales aplica, ya que indica que donde haya desnivel solo se utilizará rampas, no escalones. En la parte (7) (8) se hace referencia a los medios de salida de un edificio y la acera privada es parte de los medios de salida, por lo que, según su criterio, no cumple con dicha reglamentación. Expuso que toda diferencia de nivel debía ser atendida con una rampa y no con escalones. Su testimonio en cuanto a este particular no mereció la credibilidad del Tribunal.

61. Conforme la prueba, el Uniform Building Code de 1998 no aplica a este caso, toda vez que el edificio se construyó previo a su vigencia.

62. El perito de la parte demandante admitió también que existen dos rampas a cada lado que son de acceso y que la rampa tiene una pendiente que salva el desnivel. Sin embargo, no está a lo largo de todo el pasillo. También admitió que hay unos tubos verticales, claramente perceptibles entre lo que él identifica como la acera privada y la pública, que demarcan la propiedad. Admitió que tanto la acera pública como la privada tienen colores y material de construcción distintos.

63.Del informe pericial de la parte demandante surgen varias fotos que el Ing. Hernández [Martínez] utilizó para su evaluación. Las fotos 1 y 2 muestran unas tomas de Google Maps del año 2019. Estas reflejan el edificio desde una perspectiva amplia desde arriba y a distancia. Las fotos no están a escala, sin embargo, de las mismas se aprecia claramente las dos rampas pintadas de color azul para acceder al edificio, así como la diferencia en color y material del pasillo frontal del edificio vis a vis la acera. La foto número 3 y 4 muestran la fachada completa desde un ángulo lateral. Ambas marcan con un círculo rojo, el lugar de la caída. Se aprecia claramente la distinción de color y material entre el pasillo exterior del edificio y la acera pública.

Muestran además que frente a la puerta de salida existe una rampa pintada de color azul y a lo largo del pasillo de losas color terracota, paralelo a la acera, hay seis tubos blancos instalados verticalmente que demarcan ambas áreas. Al otro extremo del pasillo, existe otra rampa pintada color azul. La foto número 5 muestra la puerta de salida del edificio de frente, así como la rampa que accede directo a la acera, salvando cualquier desnivel. La foto número 6 muestra el acceso a la otra rampa donde se aprecia que del pasillo exterior a la acera se salva el desnivel. La foto número 7 muestra la medida del desnivel en el resto del pasillo, el cual es de aproximadamente 2 ¾". La foto número 8 es una toma más cercana del piso, la cual muestra la losa terracota y la acera. Según el perito, de esta foto se aprecia que da la impresión de que no existe un desnivel. Exhibit 19, Sumac 103. El Tribunal determina que la foto refleja claramente la diferencia entre ambas superficies y que la superficie de losa terracota está a un nivel más alto que la acera color cemento.

64. En resumen, el perito de la parte demandante expuso que, en su opinión, el edificio tiene una condición de peligrosidad en el medio de la salida lo cual causó la caída de la demandante. Esa condición de peligrosidad es el desnivel. Reiteró que los medios de salida -los que definió desde el interior del edificio a la vía pública- conforme la reglamentación aplicable, no pueden tener obstáculos.

65. La parte demandada presentó el testimonio del arquitecto Jorge Calderón López, licencia 15288. Estudió en la Florida, EUA, en A&M University, Tallahassee, donde obtuvo un bachillerato en Ciencias de Arquitectura. Calderón López tiene experiencia en desarrollo de obras, diseño y construcción, tanto públicas como privadas. Pertenece al Colegio de Arquitectos y Arquitectos Paisajistas de Puerto Rico. Ha presidido la Junta Examinadora de arquitectos y es miembro del American Arbitration Construction y American Institute of Architecture. Ha servido de profesor en la academia y como perito en el foro federal, estatal y administrativo. Fue certificado por el Tribunal como perito en arquitectura. (Exhibit 1, parte demandada, Sumac 97).

66. A encomienda de la parte demandada rindió un informe pericial para este caso. (Exhibit 2, parte demandada, Sumac 97). Para ello, hizo una inspección ocular en el área y entrevistó al administrador del edificio.

67. En su declaración expuso que en el lugar en el cual ocurrió la caída que es el que está revestido de losa, en vez de una "acera privada" el término correcto es "patio frontal".

68. En cuanto a la reglamentación pertinente a construcción expuso que el Reglamento número 7 estuvo vigente desde 1949 a 1998. Este se creó mediante la Ley 168. Posteriormente se redactó el Uniform Building Code, el cual tuvo vigencia desde 1998-2011 y luego de éste el código actual es el International Building Code (IBC). Por tanto, la reglamentación que aplica en este caso es el Reglamento número 7, toda vez que el Condominio Asia se construyó previo a 1998. Desconoce la fecha exacta de construcción. Conforme su análisis, dicha reglamentación no regula el área en controversia, pues contrario a la opinión del perito de la parte demandante, el área en cuestión no es un área de salida refiriéndose al Art. III A, 2.0, Reglamento número 7.

69. Según la opinión del Arq. Calderón [López] la condición del alegado desnivel no incumple con el Código de Construcción aplicable al momento de la construcción de dicha edificación. Sobre el propósito de las rampas a cada lado de ese pasillo exterior, indicó que, éstas salvan cualquier situación de desnivel. Además, expuso que los tubos verticales a lo largo de lo que denomina patio frontal, también demarcan el área entre éste y la acera. Por otra parte, expuso que el desnivel es perceptible a los sentidos y que entre una y otra acera existe clara definición de distintos colores, texturas y material. Además, expuso que el hecho de que haya rampas ambos extremos del pasillo, evidencian el desnivel existente entre el pasillo de losas y la acera pública. En resumen, expuso que el pasillo en cuestión no está en incumplimiento con el Reglamento número 7 (aplicable a la fecha de la construcción), que el desnivel existente es perceptible a los sentidos por el color de dicho pasillo el cual es terracota versus el de la acera que es cemento y por las rampas que existen en los extremos, así como los tubos a lo largo del pasillo. Por tanto, el desnivel no constituye una condición de peligrosidad. La opinión pericial del perito de la parte demandada, en unión a la prueba y fotos en autos, merece la credibilidad del Tribunal.

70. El señor Neftalí Cintrón Báez es el administrador del Condominio Asia desde el 2008. Entre sus funciones está velar por el funcionamiento del condominio. Expuso que en relación con este caso no tuvo conocimiento previo hasta que fue emplazado. Testificó que desde que funge como administrador, es la primera caída de la cual tiene conocimiento en el lugar en controversia. Añadió que en el edificio hay siete oficinas médicas que reciben aproximadamente de 300 a 500 personas mensuales, lo que resulta en 3,000 a 6,000 personas anuales y no ha habido ningún reporte de caída a excepción de este caso.

71. Admitió que previo a la demanda firmó como representante del Condominio una declaración ante la ajustadora del seguro que indicaba que a diario se recibían 500 personas visitantes en el condominio y que había 14 oficinas médicas. Al confrontársele con ello, el Sr. Cintrón Báez indicó que no fue él quien hizo el informe, sino la ajustadora, pero que lo firmó.

72. La reglamentación aplicable al caso de autos en cuanto al código de construcción es el Reglamento de Edificación también llamado Reglamento de Planificación No. 7, enmendado en 1968. Obra en los autos del caso como anejo en Sumac 130, del cual este Tribunal toma conocimiento oficial.

73. El Reglamento número 7, define en el Título I-B, artículo I-B-165 lo que constituye una "salida horizontal". Esta se define como "… la que se provee a través de una pared cortafuegos, espacio contiguo hasta ganar acceso a una torre de escape (Fire Tower)." (Véase Reglamento, pág. 12)[11].

Por consiguiente, el foro apelado declaró *No Ha Lugar* la *Demanda* presentada por la parte apelante y, en consecuencia, ordenó el cierre y el archivo de la causa con perjuicio.

---

[11] *Íd.*, págs. 94-111.

Inconforme con la determinación, la parte apelante acude ante nosotros mediante recurso de *Apelación*, en el que señalan la comisión del siguiente error:

> ERRÓ EL TRIBUNAL DE INSTANCIA AL DESESTIMAR LA CAUSA DE ACCIÓN DE LA [APELANTE] Y AL NO CONCLUIR QUE EL DESNIVEL EN EL PISO CREADO POR LA APELADA CONSTITUÍA UNA CONDICIÓN PELIGROSA QUE FUE LA CAUSA EFICIENTE DE LA CAÍDA Y LOS DAÑOS SUFRIDOS POR LA SRA. NORAT MOLINA.

El 3 de febrero de 2025, la parte apelante presentó *Alegato Suplementario de la Parte Apelante*, en el cual adujo que el TPI no valoró adecuadamente la evidencia presentada. Asimismo, arguyó que la interpretación que realizó el foro apelado en cuanto al reglamento fue una estrecha y que no aplicó bien el derecho.

Luego de emitir una *Resolución* concediéndole un término perentorio de veinte (20) días a la parte apelada para que expresara su posición, el 24 de marzo de 2025, el Condominio Asia presentó su *Alegato en Oposición a Apelación*. En síntesis, la parte apelada solicitó que este foro apelativo intermedio sostuviera la *Sentencia* apelada. Esto, debido a que, en primer lugar, no se estableció que el desnivel era peligroso y, más aún, cuando el mismo era de conocimiento de la Sra. Ileana Norat. En segundo lugar, que el TPI determinó correctamente que el desnivel no estaba regulado por el Reglamento de Edificación, *supra*. Finalmente, que de la prueba presentada era razonable pensar que si la Sra. Ileana Norat veía la condición de peligrosidad al entrar al edificio, el cual había visitado por espacio de dieciocho (18) años previo a que sucediera la caída, había un contraste marcado entre el pasillo de losas y la acera de cemento que también estaba dividido por tubos con dos rampas en cada extremo y jamás había ocurrido otra caída, el foro apelado no podía encontrar que la parte apelada había incurrido en negligencia.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II.**

**-A-**

Es norma reiterada que, los tribunales apelativos no debemos intervenir con la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos de los tribunales de primera instancia[12]. Esta deferencia hacia el foro primario responde al hecho de que el juez sentenciador es el que tiene la oportunidad de recibir y apreciar toda la prueba oral presentada, de escuchar la declaración de los testigos y evaluar su *demeanor* y confiabilidad[13]. Ahora bien, la doctrina de deferencia judicial no es de carácter absoluto, pues debe ceder ante las posibles injusticias que puedan acarrear unas determinaciones de hechos que no estén sustentadas por la prueba desfilada ante el foro primario. Se exceptúan de la regla de deferencia, las determinaciones de hechos que se apoyan exclusivamente en prueba documental o pericial, ya que los tribunales apelativos están en idéntica posición que el tribunal inferior al examinar ese tipo de prueba[14]. La apreciación de la prueba realizada por el TPI debe ser objeto de deferencia por los tribunales apelativos[15]. Como Regla general, no se intervendrá con la apreciación de la prueba, las determinaciones de hechos y las adjudicaciones de credibilidad que haga el foro de instancia[16].

En consideración a lo anterior, los tribunales apelativos deben brindarle gran deferencia al juzgador de los hechos, pues éste se encuentra en mejor posición para evaluar la credibilidad de un

---

[12] *E.L.A. v. S.L.G. Negrón-Rodríguez,* 184 DPR 464, 486 (2012); *Serrano Muñoz v. Auxilio Mutuo,* 171 DPR 717, 741 (2007), *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 770-771 (2013); *Hernández Maldonado v. Taco Maker,* 181 DPR 281, 289 (2011); *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico,* 177 DPR 345, 356 (2009).

[13] *Pueblo v. Hernández Doble,* 210 DPR 850, 864 (2022); *Santiago Ortiz v. Real Legacy et al.,* 206 DPR 194, 219 (2021); *Suárez Cáceres v. Com. Estatal Elecciones,* 176 DPR 31, 67 (2009); *López v. Dr. Cañizares,* 163 DPR 119, 135 (2004).

[14] *González Hernández v. González Hernández,* 181 DPR 746, 776-777 (2011).

[15] *Rivera Figueroa v. The Fuller Brush Co.,* 180 DPR 894 (2011); *McConnell v. Palau,* 161 DPR 734 (2004).

[16] *Suárez Cáceres v. Com. Estatal Elecciones,* 176 DPR 31 (2009); *Trinidad García v. Chade,* 153 DPR 280 (2001).

testigo y los conflictos de prueba deben ser resueltos por el foro primario[17].

No obstante, aunque el arbitrio del juzgador de los hechos es respetable y merece deferencia, no es absoluto y una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal. *Méndez de Rodríguez v. Morales Medina*, 142 DPR 26 (1996). Si un análisis integral de la prueba refleja que las conclusiones del tribunal *a quo* están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, éste ha cometido un error manifiesto[18]. Por lo tanto, en vista de dicha función revisora este Tribunal -por vía de excepción- puede intervenir con la apreciación de la prueba que ha hecho el foro de instancia cuando existe error manifiesto, prejuicio, parcialidad o pasión por parte del juzgador de los hechos[19].

De otro lado, es principio establecido que un tribunal apelativo está en la misma posición que el TPI en cuanto a la apreciación de prueba documental o pericial[20]. Por tanto, corresponde a la parte que impugna el peso de probar que el dictamen fue arbitrario, irrazonable o que se tomó en ausencia de evidencia sustancial, todo lo cual implicaría error manifiesto[21]. Es por ello por lo que en casos donde existe conflicto entre las pruebas, corresponde precisamente al tribunal de instancia dirimirlo[22].

En consecuencia, la intervención de un foro apelativo con la evaluación de la prueba testifical únicamente procede en casos en

---

[17] *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345 (2009); *Ramírez Ferrer v. Conagra Foods P.R.,* 175 DPR 799 (2009).
[18] *Íd.* Véase también, *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 908-909 (2012); *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*, supra, pág. 356, *S.L.G. Rivera Carrasquillo v. A.A.A.*, *supra*; *Ramírez Ferrer v. Conagra Foods P.R., supra.*
[19] *Rolón García v. Charlie Car Rental, Inc.*, 148 DPR 420 (1999); *López Vicil v. I.T.T. Intermedia, Inc.,* 142 DPR 857 (1997); *Pueblo v. Collado Justiniano,* 140 DPR 107 (1996).
[20] *Castrillo v. Maldonado*, 95 DPR 885 (1968).
[21] *Gallardo v. Petiton,* 132 DPR 39 (1992); *Henríquez v. C.E.S.,* 120 DPR 194 (1987)*; Rivera Pérez v. Cruz Corchado,* 119 DPR 8 (1987); *Quintana Tirado v. Longoria,* 112 DPR 276 (1982).
[22] *López Vicil v. ITT Intermedia, Inc., supra.*

que un análisis integral de dicha prueba pueda causar en el ánimo del foro apelativo una insatisfacción o intranquilidad de conciencia tal que estremezca el sentido básico de justicia[23]. Los foros apelativos pueden dejar sin efecto las determinaciones de hechos realizadas por el foro de instancia, siempre que "del examen de la totalidad de la evidencia el Tribunal de revisión queda definitiva y firmemente convencido que un error ha sido cometido, como es el caso en que las conclusiones de hecho están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida"[24].

**-B-**

El Artículo 1802 del Código Civil de Puerto Rico[25] establece lo siguiente: "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado"[26] [...]. Así pues, nuestro más Alto Foro ha establecido que es indispensable probar los siguientes elementos para que proceda la reparación de un daño: (1) que el acto u omisión haya sido hecho de manera culposa o negligente; (2) que exista una relación causal entre el acto u omisión culposa o negligente y el daño ocasionado; y (3) que se le haya causado un daño real al reclamante[27].

Por su parte, el término "daños" ha sido definido múltiples veces por el Tribunal Supremo de Puerto Rico (TSPR) como todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra[28]. Por otro lado, la culpa o negligencia es la falta del debido cuidado que consiste en no anticipar y prever las consecuencias racionales

---

[23] *Pueblo v. Cabán Torres*, 117 DPR 645 (1986).
[24] *Maryland Casualty Co. v. Quick Const. Corp.*, 90 DPR 329, 336 (1964).
[25] Código Civil vigente al momento de los hechos.
[26] 31 LPRA sec. 5141.
[27] *Nieves Díaz v. González Massas*, 178 DPR 843, 843 (2010).
[28] *López v. Porrata Doria*, 169 DPR 135, 151 (2006); J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1983, T. 2, Vol. 3, pág. 92.

de un acto, o la omisión de un acto, que una persona prudente y razonable habría previsto en las mismas circunstancias[29].

Para que surja la responsabilidad civil bajo el precitado Artículo 1802, *supra*, hay que establecer si ha intervenido culpa o negligencia y si existe el necesario nexo causal entre el evento culposo y el daño sufrido. En Puerto Rico rige la teoría de la causalidad adecuada y dicha teoría postula que causa es aquella que comúnmente produce el daño[30]. Conforme a ella, no es causa adecuada toda condición sin la cual no se hubiese producido el resultado, sino aquella que ordinariamente lo produce según la experiencia general[31].

Es decir, es la parte demandante quien tiene el peso de probar sus alegaciones mediante la presentación y preponderancia de prueba a base del criterio de probabilidad[32]. La suficiencia, contundencia o tipo de prueba presentada, así como el valor que los Tribunales le darán dependerá de las circunstancias particulares de cada caso de conformidad con nuestro derecho probatorio[33].

Relacionado a los daños ocurridos en establecimientos comerciales, el TSPR ha resuelto en múltiples ocasiones que una persona o una empresa que opera un establecimiento abierto al público con el propósito de llevar a cabo operaciones comerciales para su propio beneficio tiene el deber de mantener dicho establecimiento en condiciones tales de seguridad que sus clientes no sufran daño alguno[34]. Sin embargo, deberá observarse que el dueño de un establecimiento comercial no es un asegurador absoluto de la seguridad de sus visitantes y su deber solamente se

---

[29] *Nieves Díaz v. González Massas, supra,* pág. 844.
[30] *Jiménez v. Pelegrina Espinet,* 112 DPR 700 (1982).
[31] *Negrón García v. Noriega Ortiz,* 117 DPR 570, 575 (1986).
[32] *Vaquería Garrochales, Inc. v. A.P.P.R.,* 106 DPR 799 (1978); la Regla 110 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 110.
[33] *Castro Ortiz v. Mun. de Carolina,* 134 DPR 783 (1993).
[34] *Ramos v. Wal-Mart,* 165 DPR 510, 513 (2005); *Colón y otros v. K-mart y otros,* 154 DPR 510, 518 (2001).

extiende al ejercicio del cuidado razonable para su protección[35]. Es decir, no se le impone al dueño de un establecimiento comercial una responsabilidad absoluta frente a cualquier daño sufrido por sus clientes[36].

De esta forma, se ha dispuesto que los propietarios de establecimientos comerciales son responsables ante sus clientes por los daños ocasionados a causa de aquellas condiciones peligrosas existentes que eran de su conocimiento o su conocimiento le era imputable[37]. Sobre este particular, la parte demandante tiene el peso de la prueba para demostrar que el dueño del establecimiento no ejerció el debido cuidado para que el local fuese seguro[38]. Es decir, "tiene la obligación de poner al tribunal en condiciones de poder hacer una determinación clara y específica sobre negligencia mediante la presentación de prueba a esos efectos"[39].

Amparado en lo anterior, para imponer responsabilidad en los casos de accidentes en establecimientos comerciales los demandantes tienen que probar, y los tribunales tienen que determinar, los siguientes dos requisitos indispensables: 1) si existía una condición peligrosa; y 2) que la existencia de tal condición era del conocimiento de la parte demandada o se podía imputársele a éste tal conocimiento[40].

-C-

El Reglamento de Edificación, *supra*, fue adoptado a los fines de fomentar, asegurar y proteger en la mejor forma posible "la seguridad, salud, comodidad y bienestar común, mediante requisitos que garanticen en los edificios y estructuras la solidez estructural, estabilidad, salubridad, luz y ventilación adecuadas, y

---

[35] *Ramos v. Wal-Mart, supra,* pág. 513; *Goose v. Hilton Hotels,* 79 DPR 523, 527 (1956).
[36] *Colón y otros v. K-mart y otros, supra,* pág. 513.
[37] *Cotto v. C.M. Ins. Co.,* 116 DPR 644 (1985).
[38] *Íd.,* pág. 650.
[39] *Íd.,* pág. 650.
[40] *Ramos v. Wal-Mart, supra,* pág. 514.

la protección de la propiedad contra incendios y otros riesgos incidentales" a la construcción y uso de los mismos[41].

Pertinente a la controversia que nos ocupa, el Título I-B, Art. I-B-165 del Reglamento de Edificación, *supra*, establece la definición del término de "Salida Horizontal". Esta se define como "la que se provee a través de una pared cortafuegos, espacio contiguo hasta ganar acceso a una torre de escape (Fire Tower)"[42].

Por otro lado, el Título III-A del precitado reglamento dispone lo siguiente:

III-A-O – Disposiciones Generales

ARTÍCULO III-A-1.0 – General

1. Todos los edificios de nueva construcción, excepto las viviendas, serán provistos de medios de salida conformes a los requisitos estipulados en esta Parte. Disponiéndose, que aquellas salidas no requeridas específicamente por este Reglamento no tendrán que ser conforme a tales disposiciones.

2. El Oficial de Permisos podrá requerir medios de salida adicionales a los requeridos por este Reglamento siempre que exista un riesgo de fuego fuera de lo común y ello sea necesario para garantizar la seguridad de los ocupantes.

3. No se procederá a hacer ninguna alteración o cambio en el carácter del uso de un edificio, a menos que las salidas del edificio sean construidas conforme a los requisitos establecidos en este Reglamento sobre el nuevo uso.

ARTÍCULO III-A-2.0 – Tipos de Salidas Permitidos

Las salidas consistirán de puertas en combinación con: escaleras interiores o exteriores, escaleras mecánicas, rampas, salidas horizontales, pasillos y corredores por los cuales puedan los ocupantes de un edificio salir con seguridad desde un cuarto o espacio, a la calle.

1. Podrán conectar al mismo pasillo o corredor dos o más puertas de salida siempre y cuando que dicho pasillo o corredor tenga un cerramiento de tabiques que lo separen de escaleras de salida y de otras partes del edificio, cuyos tabiques tendrán una resistencia al fuego no menor de una hora.

2. Las escaleras, rampas, pasillos y corredores utilizados para las salidas requeridas en este Reglamento serán de construcción incombustible, a menos que de otro modo sea específicamente permitido en los títulos III-S y III-E.

3. El declive máximo de los pisos en las salidas no excederá de 1 en 10.

---

[41] Art. I-A-2.0 del Reglamento de Edificación, *supra.*
[42] Art. I-B-165 del Reglamento de Edificación, *supra.*

**III.**

Nos corresponde evaluar si el TPI incidió al declarar *No Ha Lugar* la *Demanda* presentada por la parte apelante y, en consecuencia, ordenar el cierre y el archivo de la causa con perjuicio.

Debemos particularizar que ambos peritos se cualificaron para declarar sobre si el nivel en la acera constituye o no una condición peligrosa y negligente desde el punto de vista de la ingeniería. Al respecto, el ingeniero Iván Omar Hernández Martínez (Ing. Hernández Martínez) declaró lo siguiente[43]:

> P. Cómo resultado de la encomienda que se dio, ¿qué es gestión si alguna usted hizo en relación o investigación si alguna en el lugar de que se le identifico el accidente?
>
> R. Bueno, pues yo examiné, fui al sitio a examinar físicamente con detenimiento lo que lo, lo, lo, lo que ella narró y, ver la lógica, ¿no? ... Entonces, veo que están estas dos aceras paralelas, una que es privada, forrada con losetas, y la otra que es la municipal, que es pública. Entre ellas hay un desnivel. Un desnivel que, que realmente cuando uno va de salida, es imperceptible. Si venías en dirección contraria, entrando, es más fácil verlo, porque va de un punto más bajo, a más alto, aun cuando es pequeño el escalón, es mas fácil verlo. Pero de salida no se ve y da la impresión de que es como un cambio de, de, de piso, como en la casa de uno, que a veces uno tiene el pasillo con un tipo de loseta y la sala con otro tipo de loseta ... Y así que ella entendió, o que ella percibió. Y cuando pone el pie, ahí pues cae. Y entonces, pues en efecto, existe a todo lo largo de esa acera, ese desnivel que fluctúa diría entre a pulgada y media, dos, dos y media hasta tres pulgadas...

En alusión a sus hallazgos en el Informe pericial que suscribió el Ing. Hernández Martínez declaró:

> P. Le preguntaba sobre el desnivel.
>
> R. Violatorio de los códigos de, de, de construcción, tanto del, del Reglamento de Edificación Número Siete, que yo cité aquí como el del [ININTELIGIBLE] y también, eh, eh, eh, contradice las normas de, de, de regulación de la de la American, de la, de la, American, ADA. O sea, no puede haber un escalón en un medio de salida horizontal, no puede haber escalón. La salida tiene que ser continua, uniforme sin

---

[43] TPO testimonio del Ing. Hernández Martínez, pág. 20 líneas 11-al 25.

obstáculos para seguridad de las personas que TRANSITAN[44].

El perito aludió que no hay ningún tipo de rotulación ni nada[45], explico *si usted viene caminando de la parte de loseta hacia la parte de cemento, fácilmente no se percata de que hay un desnivel. (Ininteligible), sobre todo personas mayores, entonces, pone un pie en ese borde y se vira el pie y la caída es probable*[46]. Manifestó que, el Reglamento de Edificación de Puerto Rico, aunque no dispone de referencia específica a este tipo condición particular, si existe disposiciones que hacen alusión a la seguridad de las personas que utilizan los edificios construidos durante su vigencia[47]. Además, declaró que a lo largo de esas dos aceras hay dos pequeñas rampas para impedidos que cumplen, pero son dos, dos, dos pequeñas. El todo el resto de las acera que están abiertas con medio de salida, de entrada y salida, no tienen esa protección[48]. Añadió que aplicaba el *Uniformed Building Code 1997*[49].

Contrario a lo alegado por la parte apelante, y durante el contrainterrogatorio el Ing. Hernández Martínez testificó:

P. Usted también hace referencia a dos tipos de códigos.

R. Si.

P. Ok. Usted no sabe la fecha en que fue construida el edificio, ¿correcto?

R. Edificio, esa zona fue construida, yo no puedo dar una fecha exacta, pero por conocimiento personal, esa zona de Santurce, esos edificios fueron construidos a principio de la década de los setenta por ahí. Los edificios[50].
…

P. Ok. La realidad, su informe no existe referencia específica al Reglamento de Edificación donde se, establezca que ese desnivel está en incumplimiento, ¿correcto?[51]

---

[44] *Íd.*, pág. 21, líneas 9-4.
[45] *Íd.,* pág. 23, líneas 18-22.
[46] *Íd.,* pág. 23, líneas 1-4.
[47] *Íd.*, pág. 25, líneas 4-8.
[48] *Íd.*, pág. 28, líneas 4-6.
[49] *Íd.*, pág. 29, líneas 8-9.
[50] *Íd.*, pág. 40, líneas 20-29.
[51] *Íd.*, pág. 45, líneas 18-22.

R.  No. Yo el informe mío hace un comentario general donde se refiere a seguridad, al medio de salida

…

R.  En el informe mío yo no menciono que el reglamento se refiera al desnivel. Exacto, no lo dice. El informe se refiere…[52]

Testificó que no existe alegación de que las losas fuesen resbaladizas[53], que existen dos rampas pintadas de azul y que entre las rampas y la loseta de entrada color terracota no hay desnivel[54].

Por su parte, acerca del lugar del accidente, el arquitecto Jorge Calderón López (Arq. Calderón López) testificó:

P.  Usted escuchó al ingeniero Hernández esta mañana decir que esa, esa área frente al, al Condominio Asia adolecía de rótulo o advertencia alguna advirtiendo sobre el desnivel que existía ¿Cuál es su opinión sobre eso?

R.  Eh, bueno yo, ciertamente tampoco vi ningún r[ó]tulo, eh, al respecto. Eh, creo que la condición de desnivel, eh, desde mi opinión, eh se puede notar, no tan solo por la rampa, porque es es el propósito de una rampa. O sea, si yo utilizo una rampa o veo que hay rampas, pues automáticamente entiendo que hay, hay desnivel. Entiendo que el color de la losa marrón con el color gris de la acera, pues ciertamente da una demarcación, eh suficiente como para entender que hay que hay dos superficies. Y pues, definitivamente era evidente para mi ver los eh, los tubos. Estos están, solo bastante altos, yo diría como de, tal vez cuarenta y dos pulgadas de alto, bastante gruesos y evidentes y son claros verlos. Así que, eh, desde mi punto de vista, eh, esas señales describen un poco el área verdad, sin necesidad de un rotulo, pero esa es mi opinión[55].

Tras examinar los turnos de directo, contrainterrogatorio y redirecto a la señora Ileana Norat, se desprende que, en primer lugar, quedó constatado que la Sra. Ileana Norat desde el año 2000 visitaba anualmente el Condominio Asia[56]. **Asimismo, la apelante admitió que, cada vez que visitaba el condominio entraba y salía por la rampa y entendía que en alguna ocasión había pasado por el lugar donde ocurrió la caída**[57]. **Es imprescindible enfatizar que la Sra. Ileana Norat conocía que el Condominio Asia contaba con**

---

[52] *Íd.*, pág. 46, líneas 15-16.
[53] *Íd.*, pág. 55.
[54] *Íd.*, pág. 57.
[55] *Íd.*, pág. 94
[56] Transcripción de la Prueba Oral (TPO), 13 y 16 de noviembre de 2023, contrainterrogatorio de la testigo Sra. Ileana Norat, págs. 22 y 29.
[57] TPO, directo de la testigo Sra. Ileana Norat, pág. 11.

**dos rampas, una para poder acceder a la entrada principal y otra para entrar hacia la losa por la derecha de la entrada principal**[58]. De igual modo, de la prueba documental presentada se estableció que dichas rampas salvaban el desnivel objeto de controversia[59].

La apelante admitió y así se desprende claramente de las fotografías presentadas, que el pasillo por el cual ésta caminó tenía una superficie de losas color terracota[60]. El mencionado pasillo era paralelo a la acera, así pues, entre el pasillo y la acera, además del color distintivo, había unos tubos blancos instalados en forma vertical que demarcaban donde terminaba el pasillo de losa y dónde comenzaba la acera[61].

De igual manera, se demostró que, desde la acera del frente, si se observaba al Condominio Asia, se podía percibir que existía un desnivel entre la acera pública y el pasillo exterior del edificio[62]. Así pues, evidentemente, la Sra. Ileana Norat a sabiendas de que conocía el lugar, el cual tenía un contraste entre el pasillo color terracota, la acera pública color cemento y los tubos que demarcan donde terminaba el pasillo y dónde comenzaba la acera, estableciendo la existencia del desnivel, no utilizó la rampa que quedaba inmediatamente a la salida del edificio y tampoco la otra rampa al extremo del pasillo[63].

Por su parte, la parte apelada pudo establecer que, no conocía la existencia de una condición peligrosa, pues el desnivel estaba salvado por las rampas y los tubos, los cuales demarcaban la diferencia entre el pasillo y la acera. De igual modo, se demostró que la administración del edificio no tenía conocimiento de que hubiesen

---

[58] TPO, contrainterrogatorio de la testigo Sra. Ileana Norat, págs. 22-23. Véase, Apéndice 38 del recurso de *Apelación*, págs. 170-171

[59] Véase, Sentencia Determinación de hecho núm. 69 y Apéndice 38 del recurso de *Apelación*, págs. 170-171.

[60] Apéndice 38 del recurso de *Apelación*, págs. 170-171 y TPO, cotrainterrogatorio de la testigo Sra. Ileana Norat, pág. 28.

[61] TPO, contrainterrogatorio de la testigo Sra. Ileana Norat, pág. 31.

[62] TPO, contrainterrogatorio de la testigo Sra. Ileana Norat, pág. 32.

[63] Véase, Sentencia Determinación de hecho núm. 27.

reportado una caída en el lugar que alegaba la Sra. Ileana Norat Molina, pues el único incidente reportado en relación con el desnivel en controversia fue el de la apelante[64].

Finalmente, es menester puntualizar que la parte apelante no pudo establecer mediante la prueba presentada que el Condominio Asia violó algún código de construcción aplicable en el caso de autos. Si bien el perito de la parte apelante, el Ing. Hernández Martínez, admitió en su testimonio que el código aplicable en el caso de autos era el Reglamento de Edificación, *supra,* también aceptó que, el mencionado reglamento no disponía referencia específica al tipo de condición en particular referente a la controversia del caso de marras[65]. A decir verdad, en lo pertinente a la controversia, la única definición que proveía el Reglamento de Edificación, *supra,* para el término de "Salida Horizontal" es "la que se provee a través de una pared cortafuegos, espacio contiguo hasta ganar acceso a una torre de escape (Fire Tower)"[66].

Somos de la opinión que la precitada disposición no es de aplicabilidad al caso, sin embargo, asumiendo que lo fuere, entendemos que el Condominio Asia cumplió con la misma. De la foto que se desprende del informe pericial del Ing. Hernández Martínez, se pudo observar que, la salida del edificio hacia la acera salvaguardaba el desnivel porque precisamente había una rampa[67]. Igualmente, del informe se pudo ver claramente que la salida del edificio era una puerta de cristal que da al pasillo de losas terracota y a su vez, directamente a la acera[68]. El acceso del pasillo de losas a la acera de manera directa estaba salvado con una rampa a ambos extremos del edificio, pero principalmente en frente de la puerta de

---

[64] TPO, directo del testigo Sr. Neftalí Cintrón Báez, pág. 128.
[65] TPO, directo del testigo Ing. Hernández Martínez, pág. 57.
[66] Art. I-B-165 del Reglamento de Edificación, *supra.*
[67] Véase, Apéndice 38 del recurso de *Apelación*, pág. 171.
[68] *Íd.*

salida del Condominio Asia[69]. Por tanto, en ese medio de salida, no existía desnivel alguno, sino una rampa pintada de azul la cual daba acceso directo a la acera pública. Esta realidad va acorde con el Artículo III A-2.0 del Reglamento de Edificación, *supra*[70].

De conformidad con la prueba documental y testifical, es forzoso concluir que, **la parte apelante no revirtió el peso de la prueba para demostrar que el dueño del establecimiento no ejerció el debido cuidado para que el local fuese seguro**[71]. **Es decir, "tiene la obligación de poner al tribunal en condiciones de poder hacer una determinación clara y específica sobre negligencia mediante la presentación de prueba a esos efectos"**[72], lo cual no hizo en el caso de autos.

Al aplicar la norma reiterada sobre la deferencia hacia el TPI este foro **no intervendrá con la apreciación de la prueba hecha por el juzgador de los hechos, salvo que exista error manifiesto, pasión, prejuicio o parcialidad**[73]. En ese sentido, evaluada la prueba testifical y documental presentada por la parte apelante, concluimos que, no pudo establecer que el lugar de la caída constituía una condición peligrosa y la existencia de un deber incumplido. Por lo cual, el foro primario no incidió al declarar *No Ha Lugar* la *Demanda* presentada por la parte apelante y ordenar el cierre y archivo de la causa con perjuicio. Colegimos que el error no fue cometido.

---

[69] *Íd.*

[70] ARTÍCULO III-A-2.0 – Tipos de Salidas Permitidos
Las salidas consistirán de puertas en combinación con: escaleras interiores o exteriores, escaleras mecánicas, rampas, salidas horizontales, pasillos y corredores por los cuales puedan los ocupantes de un edificio salir con seguridad desde un cuarto o espacio, a la calle.
1. Podrán conectar al mismo pasillo o corredor dos o más puertas de salida siempre y cuando que dicho pasillo o corredor tenga un cerramiento de tabiques que lo separen de escaleras de salida y de otras partes del edificio, cuyos tabiques tendrán una resistencia al fuego no menor de una hora.
2. Las escaleras, rampas, pasillos y corredores utilizados para las salidas requeridas en este Reglamento serán de construcción incombustible, a menos que de otro modo sea específicamente permitido en los títulos III-S y III-E.
3. El declive máximo de los pisos en las salidas no excederá de 1 en 10.

[71] *Íd.*, pág. 650.

[72] *Íd.*, pág. 650.

[73] *Gonzalez Hernández v. González Hernández,* 181 DPR 746, 776-777 (2011).

**IV.**

Por los fundamentos antes expuestos, se ***confirma*** la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones